**Wayne RIDDICK and Martin Teasley, Appellants,**

v.

**UNITED STATES, Appellee.**

Nos. 99–CF–150, 99–CF–300.

District of Columbia Court of Appeals.

Argued Jan. 22, 2002.

Decided Sept. 12, 2002.

---

Bradford P. Johnson, Washington, DC, appointed by the court, for appellant Wayne Riddick.

G. Godwin Oyewole, Washington, DC, appointed by the court, for appellant Martin Teasley.

Bernard J. Delia, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Elizabeth Trosman and Eileen F. Sheehan, Assistant United States Attorneys, were on the brief, for appellee.

Before STEADMAN, RUIZ and GLICKMAN, Associate Judges.

RUIZ, Associate Judge:

Wayne Riddick and Martin Teasley appeal their jury convictions of assault with intent to kill while armed[1] and aggravated assault while armed,[2] arising from their involvement in the May 19, 1998, physical assault on Denice Davis. Both appellants claim that the trial court erred in denying their respective motions for judgment of acquittal based on the insufficiency of evidence presented at trial. Teasley further contends that his constitutional right to confront witnesses against him was violated when the trial court limited his defense counsel's cross-examination of two government witnesses and that the trial court committed reversible error in not instructing the jury on the definition of "serious bodily injury" as an element of aggravated assault. We affirm.

## I. FACTS

Denice Davis testified that on the evening of May 19, 1998, she was attacked by two men while on the back porch of the apartment where she lived in an abandoned building located at 1242 Meigs Place, N.E. The two men, whom she identified as appellant Wayne Riddick and an individual named Rob Lowrey, lived together with appellant Martin Teasley in an apartment next to hers. On the evening in question, Riddick and Lowrey interrupted Davis as she was packing some belongings and accused her of stealing personal items belonging to them. According to Davis, Lowrey said, "Let's throw this bitch over the bannister," and "I'm going to kill this bitch." He then hit Davis in the face and pushed her up against a wall, and both men began kicking and beating her as she tried to make her way out of the apartment.

The attack soon became more brutal as the men began using a stick to stab Davis in the head and hands. It was at this time that appellant Teasley appeared and, upon learning that it was Davis who was being attacked, joined in saying, "Let's kill this bitch." Sometime during the ensuing assault, Lowrey told Teasley to get a knife. Teasley left and returned with a butter knife, which he placed up against Davis' neck. Apparently upset at Teasley's choice of weapon, Lowrey threw the knife down complaining, "That ain't going to cut nothing," and went into his apartment. Meanwhile, Teasley and Riddick continued the assault on Davis. At one point, even though Teasley was holding her arms, Davis almost got away from the two men, but Riddick grabbed her, and Teasley started "stomping" on her. Lowrey then rejoined the attack, bringing something sharp which he used to "slice" Davis's neck. After that, Davis heard glass break and felt someone jabbing her on her head and back. She moaned in pain and screamed for help as loud as she could, crying out, "Help me, help me." The attack continued until Lowrey suddenly stood up and told the others to stop beating her. When Davis looked over the bannister, she saw that a police car had arrived.

Officer Aris Paredes testified that he and his partner, Officer Lopez, arrived on the 1200 block of Meigs Place, N.E., in response to a radio call while on routine patrol. After parking their patrol car in an alley directly behind a two-story building, the officers noticed a woman standing in the window of the building next door, pointing at the abandoned building at No. 1242. Officer Paredes then heard someone scream. Both officers immediately

---

1. D.C.Code §§ 22–501,—3202 (1996), recodified as §§ 22–401,—4502 (2001).

2. D.C.Code §§ 22–504.1,—3202 (1996), recodified as §§ 22–404.01,—4502 (2001).

turned their radios down, pulled out their flashlights and weapons, and began walking up the inside stairs of the abandoned building which led to the second floor landing. As they walked up, the officers heard a female voice cry out for help and then two other distinct male voices. One of the voices said, "Kill the bitch," while the other, rougher voice said, "You're gonna die." When Officer Paredes got to the top of the stairs, he discovered a bloodied Davis, holding on to the ledge of the balcony as she cried out for help and repeatedly attempted to stand, but fell back down.

Officer Paredes looked to the apartment to the right of the balcony (Davis's apartment) and heard the same voice as before repeat the command to "Kill the bitch." Then the officer heard the rough voice again, coming from near the door of the apartment, repeating the words "you're gonna die." At that time, Riddick stepped out of the apartment on the right and moved toward Davis as if to try to grab her by the hair. Officer Paredes raised his flashlight and gun, identified himself and ordered Riddick to stop. Riddick turned, looked at Officer Paredes and dropped a piece of glass that he was holding in his left hand. He then ran back into the apartment. Immediately after that, another man, later identified as Lowrey, emerged from the apartment on the left (the one occupied by the three men), cleaning his face with a piece of clothing. As soon as Officer Paredes turned the flashlight on the man, he ran back into the apartment.

Officer Paredes directed his flashlight back to Davis and saw her, covered in blood, stretching out her arms to him and pleading for help. When the officer asked who had attacked her, she answered, "Rob." The officer told Davis to go down the steps while he looked for the two men he had heard in the apartment on the right. As he entered that apartment, the officer discovered Teasley at the front door and ordered him to stop. Realizing that Teasley was not the same man he had seen drop the piece of glass on the landing, the officer continued to look farther into the apartment, where he found Riddick in a small room with his hands up against the wall.

Officer Paredes took Teasley, who appeared drunk, and Riddick, who seemed sober, into custody. After speaking with both men, he determined that it had been Riddick who stated, "You're gonna die," and Teasley who had said, "Kill the bitch." After both men were secured, Officer Paredes returned to Davis, getting a piece of clothing to place on her wounded neck, as "there was blood gushing out." At trial, the officer described Davis as being "bloody all over. Her hair looked like she had tomato paste over her head. That's how much blood she had. And her face was full of blood, blood was just coming out of her neck." Officer Paredes also described some blood as coming from "the back of her head."[3]

Neither appellant had suffered any wound or injury, yet each had a large amount of blood on his clothing and per-

---

3. Davis was transported by ambulance to Washington Hospital Center. Her medical records from the hospital and photographs depicting her physical condition at the time she was treated at the hospital were admitted into evidence at trial. Those records describe Davis as suffering from significant loss of blood; multiple lacerations to her head and neck, including a stab wound to the neck; open wounds and contusions on her face, neck and scalp; multiple contusions on her upper limbs; swollen head and scalp as a result of blunt force trauma; a broken rib; and nausea and vomiting upon admission. Davis underwent exploratory surgery on her neck and thyroid, during which the surgeon noted that the stab wound in Davis' neck had transected a muscle and a nerve, and that the use of staples and sutures would be required to close Davis's neck, face and scalp wounds.

son.[4] Teasley had a large blood stain on his left pants leg, a small stain on his right pants leg and visible blood stains on his shoes. Riddick had blood stains on his shirt, pants, shoes and hands.

## II. ANALYSIS

### A. Cross–Examination of Witnesses

 The more substantive claim on appeal is Teasley's contention that the trial court violated his rights under the Confrontation Clause of the Sixth Amendment to the Constitution when it prevented his trial counsel from fully examining the victim about certain prior bad acts. We decide there was no error in the trial court's limitation of Davis's cross-examination due to the lack of a proffer sufficient to indicate how her prior acts of stealing from

4. These observations were made by Crime Scene Search Officer Richard Griffin, who received the clothing appellants wore on the night of their arrest, after they had been transported to Criminal Investigation Division Headquarters.

5. We also conclude that the trial court did not err in precluding the re-cross-examination of Officer Bailey, the Crime Scene Search Officer, on issues which had been previously addressed on cross-examination. Officer Bailey had been cross-examined concerning his unsuccessful attempt to recover fingerprints from the knife found at the scene of the assault and said that he did not attempt to find fingerprints on the two pieces of broken wooden rod, which also were discovered on the landing to Davis's apartment. On redirect examination, the prosecutor asked Officer Bailey why he did not try to take any fingerprints off the sticks. Bailey replied that, due to the composition of wooden objects, fingerprint transfers are destroyed once those objects are exposed to body fluids, such as blood. On re-cross-examination, defense counsel attempted to further inquire into the officer's inability to obtain fingerprints from the wooden sticks, but that line of questioning was quickly curtailed by the trial court.

There is generally "no right to recross-examine a witness, provided the scope of any

stores bore directly on her veracity as to the issues in this trial.[5]

A witness may be cross-examined on a prior bad act that has not resulted in a criminal conviction only where (1) the examiner has a factual predicate for the question, and (2) the bad act bears directly upon the veracity of the witness in respect to the issues involved in the trial.

*Murphy v. Bonanno,* 663 A.2d 505, 508–509 (D.C.1995) (quoting *Portillo v. United States,* 609 A.2d 687, 690–91 (D.C.1992)). Reviewing the proffer in this case, it is clear that Teasley's counsel established the threshold factual predicate for questioning Davis about shoplifting, as Davis admitted that, on at least one occasion, she had committed that act.[6] *See id.* at 511 (de-

redirect examination is limited to matters raised on cross-examination." *Washington v. United States,* 760 A.2d 187, 195 (D.C.2000) (quoting *Green v. United States,* 718 A.2d 1042, 1061 (D.C.1998)). Moreover, whether or not re-cross-examination will be allowed in any given trial is left to the trial court's "broad discretion." *Id.* (quoting *Green,* 718 A.2d at 1061–62).

Here, the trial court limited Teasley's re-cross-examination of Officer Bailey once it became apparent that the line of questioning would again concern the lack of fingerprints on the wooden sticks. As the trial judge observed, "That's the area that [Teasley] raised on cross, and could fully explore, and had that opportunity." Teasley's counsel had raised the same subject during Bailey's cross-examination, albeit with less detailed exploration than during the government's re-direct. In any event, Teasley's counsel had already succeeded in communicating to the jury what was intended from this line of questioning: that no fingerprints inculpating her client were found on any of the objects recovered at the scene of the assault. Further explanation of why fingerprints could not be found on the blood-covered wooden sticks would not have exculpated Teasley.

6. Teasley's Counsel: Now, Ms. Davis, you support your drug habit by stealing, don't you?

scribing the necessary predicate as a "fairly undemanding initial scrutiny"). In proposing to cross-examine. Davis about her prior bad acts, however, Teasley was also required to show how the proposed line of questioning regarding Davis's expulsion from neighborhood stores for shoplifting bore directly on her veracity in respect to the issues involved in the trial.

We turn, therefore, to whether Davis's alleged penchant for shoplifting bore on her veracity as a witness relating to the issues in this trial.[7] As in *Murphy*, we look to federal court decisions interpreting Federal Rule of Evidence 608(b) to determine whether a particular bad act is "probative of truthfulness or untruthfulness." 663 A.2d at 509 (citing *Woodward & Lothrop v. Hillary*, 598 A.2d 1142, 1150 (D.C. 1991)) (internal quotations omitted). In that case, we held that instances of falsifying financial information with a bank-creditor and fabricating personal injury claims to secure insurance payments were probative of truthfulness. *See id.* at 510 (citing *United States v. Sullivan*, 803 F.2d 87, 90–91 (3d Cir.1986); *United States v. Reid*, 634 F.2d 469, 473–74 (9th Cir.1980)). Similarly, in *Woodward & Lothrop*, we relied

on federal court decisions holding that embezzlement was probative of truthfulness or untruthfulness in determining that the trial court had properly allowed counsel to inquire into whether the witness had been fired from a recent job because he had misappropriated company funds. 598 A.2d at 1149–1150.

■■■ Of course, shoplifting does involve dishonesty of a certain kind, but the question is "whether it indicates that a person may be more likely to commit perjury." *United States v. Amaechi*, 991 F.2d 374, 378 (7th Cir.1993). A majority of the federal circuits has concluded that stealing, in most cases, is not such an act and is thus not *per se* probative of a witness's truthfulness.[8] As explained by the Court of Appeals for the District of Columbia Circuit, bad acts probative of truthfulness or untruthfulness are those "characterized by an element of deceit or deliberate interference with a court's ascertainment of truth." *United States v. Smith*, 551 F.2d 348, 363 (D.C.Cir.1976). Larceny or petty theft is a crime of "stealth" in most cases, not of deceit, *United States v. Dorsey*, 591 F.2d 922, 936 (D.C.Cir.1978), and, there-

---

Davis: No, I don't.
Prosecutor: Objection.
The Court: Sustained.
Teasley's Counsel: Well, you have been barred from stores in the area that you hang out; isn't that correct?
Davis: Yes.
Teasley's Counsel: And why have you been barred from those stores?
Davis: That wasn't from stealing all the time.
Prosecutor: Objection.
The Court: Sustained.
Davis: One was from stealing—
The Court: Sustained.

7. We recognize that we have adopted an "expansive view" on what crimes are indicative of dishonesty for purposes of permitting prior convictions as impeachment under D.C.Code § 14–305. *See, e.g., Bates v. United States,* 403 A.2d 1159, 1161 (D.C.1979). We do not

find that precedent helpful in this instance, where we are not deciding whether a prior conviction should be allowed for impeachment purposes, but rather whether alleged prior bad acts not resulting in convictions bear directly on a witness's ability to give trustworthy testimony.

8. *See, e.g., United States v. Grandmont,* 680 F.2d 867, 871 (1st Cir.1982); *United States v. Hayes,* 553 F.2d 824, 827 (2d Cir.1977); *Government of Virgin Islands v. Testamark,* 528 F.2d 742, 743 (3d Cir.1976); *United States v. Ashley,* 569 F.2d 975, 979 (5th Cir.1978); *McHenry v. Chadwick,* 896 F.2d 184, 188 (6th Cir.1990); *United States v. Yeo,* 739 F.2d 385, 387 (8th Cir.1984); *United States v. Ortega,* 561 F.2d 803, 806 (9th Cir.1977); *United States v. Sellers,* 906 F.2d 597, 603 (11th Cir.1990); *United States v. Fearwell,* 595 F.2d 771, 776 (D.C.Cir.1978).

fore, evidence of such prior acts not resulting in conviction should usually be disallowed as impeachment evidence during cross-examination.

█ We do not mean to say that evidence of prior acts of stealing may never be admitted to impeach a witness's veracity at trial. Rather, we simply conclude that absent a showing that the prior acts of stealing involved an element of deceit or falsification, the trial court did not err in exercising its broad discretion to limit cross-examination on the subject. *See Wanke v. Lynn's Transp. Co.*, 836 F.Supp. 587, 597 (N.D.Ind.1993) ("Theft ... may or may not involve an intent to deceive.").[9] Here, there was no such showing nor request to inquire as to the manner in which Davis stole.

### B. The Jury Instruction on Aggravated Assault

█ As an element of aggravated assault, "serious bodily injury" is specifically defined as:

> [B]odily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty.

*Nixon v. United States*, 730 A.2d 145, 149 (D.C.1999). We have held that trial courts must instruct juries on the definition of serious bodily injury in aggravated assault cases. *See Gathy v. United States*, 754 A.2d 912, 916 (D.C.2000). Implicit in that requirement is that "the jury may not be left to its own experience and common sense" in defining an element such as "serious bodily injury" without the aid of a precise definition, in order to avoid the danger that "jurors may set the standard of 'aggravation' below what the legislature intended in fashioning a crime that increases twenty-fold the maximum prison term for a simple assault.'" *Zeledon v. United States*, 770 A.2d 972, 977 (D.C. 2001).

█ In this case, our review of the trial court's failure to further define "serious bodily injury" is for plain error, as there was no objection to the instruction given on the aggravated assault charge. *See Guishard v. United States*, 669 A.2d 1306, 1315 n. 16 (D.C.1995). Under that standard, not only must error be established, but also that the error was "plain" and clearly prejudicial to substantial rights. *United States v. Olano*, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); *Coates v. United States*, 705 A.2d 1100, 1104 (D.C.1998). Once these hurdles are satisfied, appellant must also show that the error resulted in a "miscarriage of justice, that is, actual innocence; or that the trial court's error seriously affected the fairness, integrity or public reputation of judicial proceedings." *Wilson v. United States*, 785 A.2d 321, 326 (D.C.2001) (internal citation and quotation omitted). In

---

**9.** The trial court ruled that

> If sufficiently related, you get to impeach credibility by proof of prior convictions, unless there is something that goes directly to the testimony in this case, and even there, you're not going to be allowed to use any extrinsic proof. And the objections remain sustained.

Although we see no application here to the trial court's allusion to the rule which precludes extrinsic evidence from being used for impeachment purposes, as there is no indication that defense counsel here was offering such evidence, the trial court had broad discretion in imposing "reasonable limits" on cross-examination to prevent, among other things, "harassment, prejudice, confusion of the issues," or "interrogation that is repetitive or only marginally relevant." *Roundtree v. United States*, 581 A.2d 315, 323 (D.C.1990) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

light of our decisions in *Nixon* and *Gathy*, the trial court's failure to define "serious bodily injury" constituted error. *See id.* It is unclear, however, whether that error can be assigned as "plain." *See Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) ("[W]here the law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that an error be 'plain' at the time of appellate consideration."). As we have previously noted, whether the law regarding the necessity of proving the "seriousness" of the victim's injury was "settled" prior to *Nixon* and *Gathy* is arguable. *See Wilson*, 785 A.2d at 326. However, even if appellant could show that the error was "plain" in this instance and that it affected "substantial rights", we are not persuaded that his conviction amounted to a "miscarriage of justice", or that the "fairness and integrity" of judicial proceedings will be undermined by the absence of the instruction in his case, in light of the trial court's complete enumeration of all the elements of the crime of aggravated assault, *see id.* at 327, and ample evidence of the seriousness of the assault inflicted on Davis, *see id.* at 329 (affirming conviction for aggravated assault despite the trial court's failure to define "serious bodily injury" because, based on the evidence presented, reasonable jurors would conclude that the victim had suffered "serious bodily injury").

### C. Sufficiency of the Evidence

■■■■ We can briefly dispose of appellants' remaining contentions that the evidence was insufficient to support their convictions. The standard we apply is as clear as our review is narrow. "[I]t is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." *Nixon*, 730 A.2d at 148 (quoting *Zanders v. United States*, 678 A.2d 556, 562 (D.C.1996)) (internal citations omitted). In determining whether there is sufficient evidence (or reasonable inferences therefrom), "we must consider the evidence in the light most favorable to the government." *Id.* (internal quotations and citations omitted).

To prove assault with intent to kill while armed, the government must prove beyond a reasonable doubt that the accused: (1) made an assault on the complainant; and (2) did so with the specific intent to kill the complainant; (3) while armed. *See id;* D.C.Code §§ 22–501,—3202 (1996), recodified as D.C.Code §§ 22–401,—4502 (2001).

A person commits the offense of aggravated assault if:

> (1) By any means, that person knowingly or purposely causes serious bodily injury to another person; or

> (2) Under circumstances manifesting extreme indifference to human life, that person intentionally or knowingly engages in conduct which creates a grave risk of serious bodily injury to another person, and thereby causes serious bodily injury.

D.C.Code § 22–504.1 (1996), recodified as D.C.Code § 22–404.01 (2001).

Although appellant Riddick conceded that he was present at the scene of the assault on Denice Davis, and that he witnessed another man, Rob Lowrey, attack Davis with a broken stick, he testified that he had told Lowrey to leave Davis alone. When Lowrey finally did so, Riddick claims he assisted Davis. He contends on appeal that there was insufficient evidence to show that he actually participated in the crime. He argues that Davis, the primary government witness against him, is an unreliable "homeless drug addict," and that, based on her questionable credibility, the government's case "should not even have

been submitted to the jury." Beyond that, he claims there was no evidence that he had any motivation to attack Davis and that the jury's verdict was irrational in that he had shown that he was incapable of "launching a physical attack" on her because he testified that at the time of the assault he had recently suffered a broken right hand and left leg when a car fell on him.

■ The jury heard not only Riddick's version of events, but also that of Davis, who described for the jury how Riddick and Rob Lowrey, both of whom she knew, had physically assaulted her. She clearly identified Riddick as the one who picked up a wooden rod and began to stab and jab her head and hands. Officer Paredes, the first police officer to arrive at the scene, identified Riddick as the individual whom he saw approach Davis, holding a piece of glass in his left hand and attempting to grab her with the other, as she crouched on the second floor landing of the abandoned building where the assault occurred. The officer also recounted how he had heard Riddick say, "You're gonna die," on two separate occasions. Moreover, the officer who inspected Riddick's clothes after his arrest testified that there were numerous blood stains on Riddick's shirt, pants, shoes and hands. From all of this, a jury could have reasonably inferred that Riddick assaulted Davis while armed, with the intent to cause her death, and that she incurred serious bodily injury as a result of the attack. Accordingly, Riddick's convictions must stand.

For his part, Teasley argues that the jury could not have reasonably inferred that he participated in Davis's assault because he was not present when the assault began, his presence at the scene was very limited, and when Officer Paredes asked Davis for the name of the person who assaulted her, she only mentioned the name "Rob." Furthermore, Teasley con-

tends, the government failed to prove two important elements of the crimes for which he was convicted. First, he argues that because he was intoxicated at the time of the assault, the government could not have shown that he possessed the specific intent necessary to commit the crime of assault with intent to kill while armed and, second, the government failed to prove that Davis had incurred the "serious bodily injury" required for a conviction of aggravated assault while armed. In addition, asserts Teasley, the trial court erred in not granting his motion for judgment of acquittal based on his defense of a third party theory.

■ We conclude that, as they were instructed, the jury could have inferred from the evidence presented that Teasley had at least aided and abetted in the armed assault on Davis. Davis testified that Teasley had retrieved the knife that was used against her, that he had alternately beat and "stomped" on her, and that he had held her arms while Riddick and Lowrey brutally attacked her. Physical evidence corroborated Davis' testimony; like Riddick, Teasley was smeared with blood when he was arrested.

■ We also disagree that the evidence of Teasley's intoxication precluded the jury from finding that he had the requisite intent to assault Davis. The jury heard testimony from Officer Paredes that he heard Teasley say "kill the bitch" as he approached the landing. Though Teasley testified that he had been drinking on the night of Davis's assault, he could not remember how much alcohol he had consumed. More importantly, no evidence was presented that he was suffering from an "incapacitating intoxication" that would negate his ability to form the specific intent to kill Davis. "Conclusory statements about the use of alcohol are insufficient to establish the necessary degree of intoxication [to negate specific intent]." *Wash-*

*ington v. United States*, 689 A.2d 568, 574 (D.C.1997).

Teasley also asserts that the government failed to prove that Davis suffered the "serious bodily harm" necessary to sustain a conviction for aggravated assault, because there was no evidence that Davis had suffered "extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty." *See Zeledon*, 770 A.2d at 974, n. 2 (conviction for aggravated assault supported by evidence that the appellant had stabbed his wife repeatedly and caused her, among other things, arterial bleeding and a broken collarbone). We have held, however, that a jury may reasonably conclude that a person has suffered "serious bodily injury" from the description of the nature and extent of their injuries. *See Gathy*, 754 A.2d at 918–19 (reasonable jury could infer that victim had sustained serious bodily injury after hearing evidence that the victim had been struck in the face with a beer bottle, bled profusely until entering a semi-unconscious state and received forty-eight stitches). "Serious bodily injury," has also been defined to include bodily injury that involves "a substantial risk of death." *See Nixon*, 730 A.2d at 149, n. 5.

In this case, Davis recounted to the jury how she moaned in pain, cried, and screamed for help during and immediately after the assault. Officer Paredes described the seriousness of Davis's injuries, giving a detailed and graphic description of her being soaked in blood and bleeding profusely from the neck. Detective Brett Smith, who was also on the scene, testified that the paramedics treating Davis told him they believed she would die as a result of her blood loss. The medical records admitted into evidence indicated that Davis's injuries were severe, including a neck wound that transected muscle and nerve which necessitated emergency exploratory surgery. From this evidence, the jury could have reasonably concluded that not only was Davis in extreme physical pain as a result of her being stabbed with a broken stick and a piece of glass, but also that she might have died as a result of her injuries had the officers at the scene not intervened to control her bleeding.

Nor do we think that the trial court erred in denying Teasley's motion for judgment of acquittal based on his assertion that he was acting to defend Rob Lowrey from Davis's attack. The jury was instructed on self-defense and counsel argued that in acting to control Davis, Teasley was trying to defend Lowrey. From the evidence presented, however, including Davis's testimony which recounted Teasley's role in the assault and Officer Paredes's identification of Teasley's voice as the one which had stated "Kill the bitch," the jury could have rejected that defense and reasonably determined that Teasley did not act in the belief that Davis was the aggressor in the altercation with Lowrey or the belief that Lowrey was in serious danger of imminent bodily harm and, thus, had himself a right of self-defense. *See Frost v. United States*, 618 A.2d 653, 661 (D.C.1992).

Thus, considering the evidence, as we must, in the light most favorable to the government, we conclude that the trial court did not err in denying either of appellants' motions for judgment of acquittal as there was sufficient evidence presented from which a reasonable mind might fairly infer guilt beyond a reasonable doubt on the charges brought against them.

*Affirmed.*