Garfield FREEMAN, Appellant

v.

UNITED STATES, Appellee.

No. 03–CF–1432.

District of Columbia Court of Appeals.

Submitted Jan. 19, 2005.

Decided Dec. 21, 2006.

Joseph Virgilio, appointed by the court, was on the brief for appellant.

Kenneth L. Wainstein, United States Attorney at the time the brief was filed, John R. Fisher, Assistant United States Attorney at the time the brief was filed, and John M. Cummings and Burke W. Kappler, Assistant United States Attorneys, were on the brief for appellee.

Before KERN, FERREN, and TERRY, Senior Judges.[*]

TERRY, Senior Judge:

Appellant was convicted of assault with intent to kill while armed ("AWIKWA"), aggravated assault while armed ("AAWA"), assault on a police officer with a dangerous weapon, and related weapons offenses, including three counts of possession of a firearm during a crime of violence ("PFCV").[1] On appeal he seeks reversal of the AWIKWA and AAWA convictions, along with their related PFCV convictions, arguing that the evidence was insufficient to support them. We affirm.

I

A. *The Government's Evidence*

At about 10:30 a.m. on December 26, 2002, Dawn Gibson, who lived in an apartment building at 5012 H Street, S.E., left her apartment to use a nearby pay telephone. She was wearing a pink ski jacket. On her way to the phone, she passed Rodney Tolbert and another man she knew only as "Bean" inside the gated area in front of the building.[2] When she returned a few minutes later, Bean was leaving, and Mr. Tolbert was standing inside the gate with another man whom Ms. Gibson later identified as appellant. Mr. Tolbert was backing up the front steps away from appellant and holding his empty hands in the air, repeatedly saying he did not "have anything." Appellant, however, advanced toward Mr. Tolbert with his hand in his pocket, saying, "Give me everything."

As Ms. Gibson started to walk past appellant, he said, "Move out of the way, sweetheart, I am about to blast his ass." Hearing this, Ms. Gibson ran into the building and headed upstairs to the second floor, where she stood in the hallway, next to a window above the front door. She looked out the window and saw appellant and Mr. Tolbert "tussling" at the gate, which Tolbert was trying to hold shut from the outside while appellant was attempting to open it from the inside. Appellant then pulled out a gun and shot Mr. Tolbert once. Ms. Gibson ran into her apartment, and from there she heard several more shots. When she looked out her apartment window, she saw appellant running between two apartment buildings.

By happenstance some officers from the Metropolitan Police Focus Mission Team were in the same neighborhood conducting a "buy/bust operation" directed toward illegal sales of marijuana. Two undercover officers, Mustafa Hammid and Angelo Battle, were part of the operation. Officer Battle was driving an unmarked pickup truck, and Officer Hammid was in the passenger seat. As they passed 5012 H Street, S.E., they saw a group of three or four men standing in front of the building.[3] Seeing nothing of concern, they drove around the block. When they returned to the same place a few minutes later, there were only two men in front of the building,

---

[*] Judge Terry was an Associate Judge of the court at the time this case was submitted. His status changed to Senior Judge on February 1, 2006.

1. Two counts of the indictment, charging armed robbery and a related PFCV, were severed before trial at the government's request.

2. According to Ms. Gibson, the area between the sidewalk and the front of the apartment building is protected by a metal gate. There are four steps just inside the gate, a landing, another set of steps, and a walkway leading to the front door of the building. The gate is normally kept locked and requires a key to unlock it.

3. Neither officer saw Ms. Gibson—or any woman—in front of the building at that time.

appellant and Mr. Tolbert. Appellant was inside the gate, and Tolbert was standing outside.

Officer Hammid testified that the two men were having a "tug of war" with the gate, and that Tolbert was pulling on it from the outside, apparently in an effort to open it.[4] He did not see appellant draw a gun because he was looking the other way, but as soon as he heard shots, he looked back and saw appellant shoot Mr. Tolbert. Officer Battle also saw appellant pull a gun from his waistband and fire at Mr. Tolbert as Tolbert was walking away from the gate, and appellant was inside the gate on the landing.[5] Both officers then saw appellant take a few steps away from Mr. Tolbert, come back, and fire more shots.

Officer Hammid immediately got out of the truck, exclaimed "Police," and fired his gun several times in appellant's direction. None of those shots hit appellant, who then ran to the rear of the building toward Hanna Place, S.E., which runs parallel to H Street. Hammid attempted to cut him off by running toward 51st Street, while Officer Battle radioed an account of what was happening and requested help.

Four other officers involved in the buy/bust operation—Ronald Royster, Dion Smith, Peter Sheldon, and Michael Mudd—were sitting in a parked car in a nearby alley and heard the gunshots. Officer Royster, the driver, activated the car's emergency lights and pulled out into the intersection of Benning Road and H Street. From there, they saw Officer Hammid shooting toward appellant.

Officer Royster, who was familiar with the neighborhood, attempted to intercept appellant as he ran toward Hanna Place. When appellant ran in front of the officers' car with a black gun in his hand, Officers Mudd, Sheldon, and Smith got out of the car and began to chase appellant on foot. As they pursued him, Officers Mudd and Sheldon repeatedly yelled, "Stop. Police. Drop the gun."[6] Appellant turned, however, and pointed his gun at Officer Mudd, whereupon Mudd fired one shot toward appellant. Although the shot did not hit him, appellant stumbled, then dropped his gun [7] and continued to run. He was eventually stopped and arrested by Officers Smith and Mudd.

During the course of the pursuit, Officer Battle, who was also a trained emergency medical technician, stayed at the site of the shooting to assist Mr. Tolbert. The officer quickly found that Tolbert had multiple gunshot wounds to his torso and back.[8] He was moaning, confused, and non-responsive, and did not look directly at Offi-

---

4. Ms. Gibson had testified that Tolbert appeared to be pushing on the gate to hold it shut from the outside, and that appellant was attempting to pull it open from the inside. Appellant later testified during the defense case that, to open the gate, one must pull it from the outside (or push it from the inside). Any confusion as to which way the gate opened was dispelled during appellant's cross-examination when a photograph established that the gate opened inward from the outside, and must therefore be pushed open.

5. Officer Hammid's testimony thus indicated that appellant and Mr. Tolbert were facing each other when appellant fired the first shot, whereas Officer Battle's testimony suggested that Mr. Tolbert's back was to appellant when appellant fired the first shot. This discrepancy was not resolved.

6. All four of the officers were wearing clothing which clearly indicated that they were with the police department.

7. Another officer from the buy/bust team later recovered the gun.

8. Officer Battle, while examining Mr. Tolbert "from head to toe" to ascertain the extent of his injuries before the ambulance arrived, found that he had no weapon of any kind on his person.

cer Battle. Because Tolbert appeared to be losing consciousness, Officer Battle employed a medical technique called a "sternum rub" to keep him awake. In addition, Officer Battle determined that Mr. Tolbert was unable to push down with his right foot. Ms. Gibson, meanwhile, approached Officer Battle as he was attending to Mr. Tolbert's injuries and recounted what she had seen.

Mr. Tolbert was transported by ambulance to Washington Hospital Center, where he was treated by Dr. Dennis Wang, a trauma surgeon and the director of trauma services. Tolbert was alert and awake when he arrived at the hospital, but complained of back pain and weakness in his lower right leg. According to Dr. Wang, Mr. Tolbert was not in danger of losing consciousness on account of blood loss. He did not receive a blood transfusion; he was not placed in intensive care; he was not paralyzed; and he did not receive emergency surgery. In short, he was stable, although he did receive "emergency care." The paramedics who treated Mr. Tolbert en route to the hospital had administered saline solution intravenously to increase his blood pressure and prevent shock.

The doctor testified that Mr. Tolbert suffered three gunshot wounds, all on his right side: one between his ribs and his hip, one close to the right hip, and one in the lumbar region near the small of his back. The last was the most severe; the bullet broke a vertebra and lodged inside his body, causing a loss of sensation in Mr. Tolbert's lower right leg and ankle. Dr. Wang stated that Mr. Tolbert was at risk of paralysis if his spine started to swell in the area where the bullet lodged. In addi-

tion, the bullet was an inch from Mr. Tolbert's aorta, any damage to which could cause a major hemorrhage resulting in prolonged hospitalization, or perhaps even death.

### B. The Defense Evidence

Appellant testified that on the morning of December 26 he drove to a store on H Street to get some juice. As he passed the building at 5012 H Street, he saw a group of men standing inside the gate and decided to stop and buy some marijuana.[9] He pulled over and spoke with Mr. Tolbert, whom he recognized from having seen him in the neighborhood, although they had not actually met. Tolbert told appellant to park his car; appellant complied, but parked on the other side of the street. As he got out of the car, he took with him a handgun he had found a week earlier and had kept in his glove compartment since then, because he did not want to leave the gun in his car unattended. He also said he took the gun with him because he was wearing "a very expensive jacket" and because he was in "a really bad neighborhood."

When appellant approached the apartment building, Mr. Tolbert—who by then was the only person present[10]—opened the gate and let him inside. The two men stood on the steps and discussed a possible drug sale, but appellant decided not to buy the marijuana because he believed it was of poor quality. At this Tolbert became upset, and the two had a "verbal slashing back and forth." As appellant turned to leave, Mr. Tolbert grabbed him by the arm, whereupon appellant turned around and "jerked back off of him." Tolbert then punched appellant in the jaw. Appel-

9. Appellant said he had bought marijuana at the same location four or five days before Christmas. He also had bought marijuana there a year or two earlier.

10. Appellant said he did not see a woman in a pink ski jacket in front of the building.

lant believed Mr. Tolbert was high on PCP.[11] Tolbert walked out through the front gate, then turned around and slammed it shut. Appellant tried to get out, and a "tug of war" ensued.

Appellant then drew his gun, but Tolbert simply derided him and said, "Man, I am going to kill you." He repeated the threat and reached toward his hip or waistband. At that point appellant "guess[ed]" that Tolbert "was reaching for a handgun," so appellant raised his own gun and fired.[12] Because he intended only to flee, he did not fire directly at Mr. Tolbert, but merely in "his vicinity."[13] He denied stepping away and then coming back to continue shooting. He also testified that as soon as he fired the first shot, several other shots were fired in his direction; in particular, appellant said he saw a man in a grey sweatsuit and black skull cap shooting at him. Believing that Tolbert's friends were retaliating, he ran away. He did not know if he had hit Mr. Tolbert, and he did not see Tolbert fall to the ground.

Appellant said he ran through an alley behind the apartment building and came out on Hanna Place, where he was almost hit by a black car. He continued to run, however, because he heard car doors slamming and believed that more of Tolbert's friends were chasing him. He discarded his gun in the yard of a house because he had run out of ammunition.[14] Appellant saw that he was being chased by a white man wearing a shirt marked "Police," but he could not hear what the man was saying because he was "scared and shaken up" and "in shock from the whole incident."[15] He continued to run and was confronted a few seconds later by Officer Smith, who told appellant to "freeze" and put his hands in the air. Appellant complied because he "felt more comfortable" surrendering to a black police officer.

Appellant acknowledged on cross-examination that he had fired "wildly" in Mr. Tolbert's direction ("I can't say where the bullets went"), but he conceded that he hit Tolbert three times. He also admitted carrying an unregistered gun without a license. He said that he did not see Mr. Tolbert display a gun, but only that he saw Tolbert "make a hand gesture" which led him to believe that he was "reaching for" a gun. Finally, he said he did not see any lights or sirens on the police car or hear its occupants identify themselves as police officers.

## II

■ When this court considers a claim of evidentiary insufficiency, it must view the evidence "in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact...." *Curry v. Unit-*

11. Dr. Wang testified that at the hospital Mr. Tolbert said he had used marijuana that day, but he concluded that Tolbert's mental state was not affected.

12. Appellant could not recall how many shots he fired because he "was really panicking" and was acting "out of fear." He had never fired this gun before.

13. According to the trial transcript, appellant testified that he was "shooting [in] his facility." We conclude that this was an error on the part of the court reporter and that "facility" should reasonably be read as "vicinity."

14. According to appellant, Officer Mudd was not in the yard when he discarded the gun. He said he never pointed the gun at Officer Mudd, because "[i]t would have been impossible [for me] to point a weapon at him that I didn't have."

15. He admitted, however, that he did hear Officer Mudd say, "I will shoot," but he did not hear any shots fired.

*ed States*, 520 A.2d 255, 263 (D.C.1987) (citations omitted). We do not distinguish between direct and circumstantial evidence, and "the government is not required to negate every possible inference of innocence." *Jones v. United States*, 625 A.2d 281, 288 (D.C.1993) (citation omitted). Rather, "[i]t is only where the government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt that this court can reverse a conviction." *Zanders v. United States*, 678 A.2d 556, 563 (D.C. 1996) (citations omitted). *See also Nelson v. United States*, 601 A.2d 582, 593 (D.C. 1991) (citing cases).

### A. *Assault with Intent to Kill While Armed*

Appellant contends that there was insufficient evidence to sustain his AWIKWA conviction. Specifically, he argues that Ms. Gibson's testimony, upon which the government primarily relied, was directly contradicted by the testimony of Officers Hammid and Battle. He also argues that the government failed to present evidence contradicting his account of the events prior to the shooting, including his claim that he acted in self-defense. For the reasons that follow, these arguments lack merit.

■ To prove AWIKWA, the government must prove, beyond a reasonable doubt, that the defendant (1) committed an assault [16] on the victim, and (2) did so with the specific intent to kill, (3) while armed with a dangerous weapon. *Riddick v. United States*, 806 A.2d 631, 639 (D.C. 2002). Viewing the evidence in the light most favorable to the government, we hold that it was sufficient to prove all three elements. In the first place, as the government points out, appellant's own testimony established that he committed an assault while armed. He pulled his gun in order to frighten Mr. Tolbert, and he had the apparent present ability to injure Mr. Tolbert because he knew the gun was loaded. Moreover, his intent to commit the assault may be inferred from doing the act that constituted the assault. *Macklin, supra* note 16, 733 A.2d at 964 (citing cases).

■ The evidence also showed that appellant had the specific intent to kill Mr. Tolbert. Even though appellant testified that he merely fired in Tolbert's direction, this court has held that causing another person to be in a "zone of harm" is sufficient to establish a specific intent to kill. *See, e.g., DiGiovanni v. United States*, 810 A.2d 887, 895 (D.C.2002) (evidence was sufficient to establish AWIKWA when defendant fired in victim's direction at close range, thereby placing him in a "zone of harm"); *Nixon v. United States*, 730 A.2d 145, 149 (D.C.1999) ("where the means employed to commit the crime ... created a zone of harm around [the] victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone" (citation omitted)).

Moreover, three eyewitnesses—Officer Hammid, Officer Battle, and Ms. Gibson—all testified that they saw appellant shoot Rodney Tolbert in front of the apartment building on H Street. Appellant claims that Ms. Gibson's version of the events was contradicted by the testimony of the two officers, and was thus insufficient to prove that the events occurred as she described them. This argument is without merit. Ms. Gibson stated that she left the build-

---

16. To establish an assault, the government must show (1) an attempt, with force or violence, to injure another, or a menacing threat, which may or may not be accompanied by a specific intent to injure; (2) the apparent present ability to injure the victim; and (3) the intent to do the act constituting the assault. *Macklin v. United States*, 733 A.2d 962, 964 (D.C.1999); *Ray v. United States*, 575 A.2d 1196, 1198 (D.C.1990).

ing to make a phone call, and that when she returned, she saw appellant and Mr. Tolbert arguing just inside the front gate. When appellant told Ms. Gibson to "move out of the way" because he was "about to blast [Tolbert's] ass," Ms. Gibson ran into the building and up the stairs. Once she was safely inside, she looked out the window and saw the same two men "tussling" at the gate. Appellant then shot Mr. Tolbert. Officers Hammid and Battle both testified that when they drove past the building the second time, they saw only appellant and Tolbert. Officer Hammid said that he saw Mr. Tolbert and appellant having a "tug of war" with the gate. He did not see appellant draw his gun, but he did see appellant shoot Mr. Tolbert. Officer Battle did see appellant pull a gun from his waistband and shoot Mr. Tolbert.

■ The officers' testimony does not, as appellant maintains, "directly contradict" that of Ms. Gibson. While it is true that neither officer saw Ms. Gibson in front of the building at any point, she said she watched the shooting from inside the building, where she may well have been out of the officers' line of sight. In any event, this court has explicitly stated that "the testimony of a single witness is sufficient to sustain a criminal conviction, even when other witnesses may testify to the contrary." *Gibson v. United States*, 792 A.2d 1059, 1066 (D.C.2002) (citations omitted). The fact that there may be some inconsistencies between the testimony of one witness and another is therefore of no consequence. The jury has the "right to assess credibility and to draw reasonable inferences from the evidence it has heard." *Nelson*, 601 A.2d at 593. "[I]nconsistencies in the evidence affect only its weight, not its sufficiency, and are in any event for the jury to resolve." *Gibson*, 792 A.2d at 1066 (citations omitted).

■ Finally, appellant contends that "the government presented no evidence whatsoever which contradicted [his] account of events immediately prior to the shooting." In particular, he argues that he shot Mr. Tolbert "in fear for his life," and that the government did not adequately refute that claim of self-defense. This argument must also fail.

■ In order to raise a claim of self-defense, a defendant must show (1) that there was an actual or apparent threat of physical harm, (2) that the threat was unlawful and immediate, (3) that he honestly and reasonably believed he was in imminent danger of death or serious bodily harm, and (4) that his response was necessary to save himself from the danger. *Brown v. United States*, 619 A.2d 1180, 1182 (D.C.1992) (citing cases). When the evidence is sufficient to support a claim that the defendant acted in self-defense, the government must prove beyond a reasonable doubt that he did not. *Harris v. United States*, 618 A.2d 140, 148 (D.C. 1992). On appeal, however, the sufficiency of this evidence is reviewed in the light most favorable to the government. *Edwards v. United States*, 619 A.2d 33, 37 (D.C.1993). Moreover, a defendant "cannot raise a legitimate self-defense claim when he went out of his way to look for trouble." *Brown*, 619 A.2d at 1182 (citation omitted).

In this case the evidence was sufficient to prove beyond a reasonable doubt that appellant was not acting in self-defense. Ms. Gibson saw Mr. Tolbert backing up the steps away from appellant and holding his hands in the air, "nervous" and in fear. She heard appellant exclaim that he was "about to blast [Tolbert's] ass." Mr. Tolbert was not armed, and appellant admitted that he emptied his gun in Tolbert's direction. Appellant testified that Mr. Tolbert threatened to kill him, but it was

up to the jury to believe or disbelieve his account. *See Beaner v. United States,* 845 A.2d 525, 538 n. 16 (D.C.2004) ("[t]he jury ... was in the best position to judge [appellant's] credibility, and its decision [not] to believe him must be given 'full play'" (citing *Curry,* 520 A.2d at 263)). There is thus no reason for us to overturn the jury's finding that appellant did not act in self-defense and was therefore guilty of AWIKWA.

### B. *Aggravated Assault While Armed*

██ Appellant also maintains that there was insufficient evidence to support his conviction of AAWA. He asserts, in particular, that the government failed to prove beyond a reasonable doubt that the nature of Mr. Tolbert's wounds constituted "serious bodily injury" as defined by statute and by this court. We reject this argument as well.

D.C.Code § 22–404.01 (2001) provides:

(a) A person commits the offense of aggravated assault if:

(1) By any means, that person knowingly or purposely causes serious bodily injury to another person; or

(2) Under circumstances manifesting extreme indifference to human life, that person intentionally or knowingly engages in conduct which creates a grave risk of serious bodily injury to another person, and thereby causes serious bodily injury.

Although "serious bodily injury" is not defined in this statute, which makes aggravated assault a crime, that term is defined in another statute dealing with sexual abuse. According to D.C.Code § 22–3001(7) (2001):[17]

"Serious bodily injury" means bodily injury that involves a substantial risk of death, unconsciousness, extreme physi-

cal pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.

This court in *Nixon, supra,* adopted that definition "for the purpose of determining whether the government met its burden to prove 'serious bodily injury' under the aggravated assault statute." *Nixon,* 730 A.2d at 150.

In *Nixon* the evidence showed that the two victims of a shooting "were able to run and thus were not unconscious and did not manifest immobilizing pain." *Id.* In addition, neither victim testified, and no medical evidence was introduced concerning the nature and extent of their injuries. Thus, even though the victims had been shot, we held that the government had failed to prove that either of them had suffered "serious bodily injury." It is important to point out, however, that the *Nixon* court "did not express any opinion as to the seriousness of the gunshot wounds suffered." *Beaner,* 845 A.2d at 538. It based its decision primarily on the fact that, because of the lack of evidence as to the victims' injuries, "the jury was left to speculate about whether [they] were 'serious bodily injuries' within the meaning of the aggravated assault statute." *Id.* That is not the situation presented here.

In the present case, there was ample evidence that Mr. Tolbert suffered "serious bodily injury" as that term is used in the aggravated assault statute. Although Mr. Tolbert did not testify, Officer Battle, who attended to him at the scene, and Dr. Wang, who treated him at the hospital, both described the extent and seriousness of his injuries. Officer Battle testified that Mr. Tolbert appeared to be losing consciousness after being shot, and that he had to employ a special medical technique

---

**17.** Formerly codified as D.C.Code § 22– 4101(7) (1996).

to keep Tolbert awake. He noted that Mr. Tolbert was unable to push down with his right foot. Tolbert was also moaning and confused, no doubt because he was in pain. In fact, Dr. Wang, the trauma surgeon at the hospital, testified that Mr. Tolbert was alert when he arrived at the hospital but was complaining of pain in his back (where he had been shot) and weakness in his lower right leg.

Given these facts, we are satisfied that the evidence was sufficient to establish that Mr. Tolbert suffered serious bodily injury. He nearly lost consciousness, he indicated that he was in pain, and he suffered from an "impairment of the function" of his right leg. *See Gathy v. United States*, 754 A.2d 912, 914, 918 (D.C.2000) (court upheld finding of serious bodily injury when victim was slashed across the face with a broken beer bottle and was never unconscious, but was "semi-unconscious," "in total shock," and "[not] totally coherent"); *cf. Anderson v. United States*, 857 A.2d 451, 464 (D.C.2004) (victim did not describe pain as extreme, but a reasonable juror could infer from the nature of the injuries and the victim's reaction to them that the pain was extreme).[18]

Moreover, Dr. Wang's testimony established that Mr. Tolbert's injuries were severe enough that they could have caused permanent damage or death, thus establishing a "substantial risk of death" under the statute. Tolbert suffered three gunshot wounds, one of which broke a vertebra and lodged inside his body, causing the loss of sensation in his lower right leg and ankle. The doctor testified that, as a result of that injury, Mr. Tolbert was at risk

of paralysis if his spine started to swell in the area where the bullet had lodged. In addition, the bullet was only an inch from Tolbert's aorta, and any damage to the aorta could cause a major hemorrhage, which would require prolonged hospitalization and might even result in death. This medical evidence was sufficient to show that Mr. Tolbert's injuries were not only severe but life-threatening. *See Chilcoat v. State*, 155 Md.App. 394, 402, 843 A.2d 240, 245 (2004) (court upheld finding of serious bodily injury when victim's injuries could have resulted in blindness or paralysis, but did not; victim's "successful recovery does not change the nature of the injury he suffered").

As the government correctly points out, the fact that Mr. Tolbert was not in critical condition, was not paralyzed, and did not receive emergency surgery "in no way mitigates the seriousness of his wounds." Officer Battle's prompt assistance at the scene of the shooting, coupled with the work of the paramedics in the ambulance on the way to the hospital, likely contributed to Mr. Tolbert's stability by the time he reached the hospital. This does not mean that his injuries were not severe; it merely shows that he had the good fortune to receive proper care. *See Riddick*, 806 A.2d at 641 (evidence was sufficient to show serious bodily injury when victim might have died as a result of her injuries if officers on the scene had not intervened to control the bleeding); *Zeledon v. United States*, 770 A.2d 972, 974 (D.C.2001) (evidence was sufficient to show serious bodily injury when medical testimony established that victim's injuries, if left untreated, could have resulted in death).

---

**18.** The victim in *Anderson* testified that her stab wound was "burning" and "very painful." The doctor who treated her said that she "was in pain when she came to the hospi-

tal" and "characteriz[ed] that pain as 'significant.'" She was taken immediately to surgery because the knife had penetrated her kidney. 857 A.2d at 464.

We therefore conclude that the evidence was sufficient to prove serious bodily injury and, accordingly, to sustain appellant's conviction of aggravated assault while armed.

III

The judgment of conviction is *Affirmed.*