Reginald EARL, Appellant,

v.

UNITED STATES, Appellee.

No. 04–CF–466.

District of Columbia Court of Appeals.

Argued Dec. 20, 2006.

Decided Sept. 20, 2007.

Thomas T. Heslep, appointed by the court, for appellant.

Valinda Jones, Assistant United States Attorney, with whom Kenneth L. Wainstein, United States Attorney at the time the brief was filed, and Roy W. McCleese III and Elizabeth Trosman, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, RUIZ, and THOMPSON, Associate Judges.

RUIZ, Associate Judge:

Following a jury trial, Reginald Earl was convicted of two counts of aggravated assault, in violation of D.C.Code § 22–404.04 (2001). On appeal, he argues that: (1) the trial court erroneously admitted expert testimony on the subject of battered woman's syndrome; (2) the trial court improperly excluded an audio-tape recording that he claims exposed the complainant's bias; and (3) there was insufficient evidence of serious injury to convict him of one of the counts of aggravated assault. We agree on the latter point, and reverse one of the convictions for aggravated assault with instructions to enter a judgment of conviction of the lesser-included offense of simple assault. We disagree that the trial court's challenged evidentiary rulings, viewed singly or cumulatively, merit reversal and, therefore, we affirm the other conviction of aggravated assault.

## Factual Summary

Appellant met the complainant, Barbara Hawkins (then Barbara Wells), in the Spring of 1997, and the two began dating soon thereafter. After they had been seeing each other for approximately one year, she became romantically involved with one of her ex-boyfriends, Steven Hawkins. She ended her relationship with appellant and eventually married Mr. Hawkins in February of 1999. Ms. Hawkins, however, continued to have contact with appellant, and ultimately left her husband in late 1999 and resumed her relationship with appellant. Two separate incidents in the Summer of 2003 formed the bases of the assault charges against appellant.

*July 9, 2003 Assault*

On July 9, 2003, at approximately 11:30 p.m. Ms. Hawkins returned to her apartment from her job as a supervisor at a half-way house. She went to sleep but awoke when she heard appellant attempting to enter her apartment.[1] Ms. Hawkins went to the front door, removed the safety chain lock, and permitted appellant to enter the apartment. Appellant watched television in Ms. Hawkins's bedroom while drinking alcohol until approximately 2:00 a.m.

Appellant then confronted Ms. Hawkins, saying he believed that some of her co-workers wanted to have sex with her. Appellant pushed Ms. Hawkins onto the bed, straddled her, and hit her with a closed fist on her stomach, face, and her "lower body part and [her] upper body part." He picked up his drink from the nightstand, poured it on her, and told her that if she informed anyone about the beating, he would claim that she was drunk and had attacked him. Appellant also kicked Ms. Hawkins in the stomach. During the assault, Ms. Hawkins told appellant she needed to use the bathroom, and appellant "got up off [of her]." As she was walking toward the bathroom, however, appellant punched her in the back, threw her back on the bed, and continued to punch her with his fists.

When appellant stopped hitting her, he went to the kitchen to get a glass of milk and cookies, and then he returned to the bedroom and climbed in bed with Ms. Hawkins. Once appellant fell asleep, Ms. Hawkins got out of bed, put on a dress, and ran out of her apartment barefoot.

Unable to find any neighbors, she walked three blocks to a payphone and called the police. She did not tell the 911 operator that appellant had assaulted her, and instead, she told the operator that she "had been beaten up by a friend ... [named] Jermaine Wilson."[2] When the police and paramedics arrived, Ms. Hawkins told them that she was "beaten by a friend" but would not disclose his name.[3]

Ms. Hawkins was taken to Greater Southeast Community Hospital, where she was examined by Julius Omole, a physician's assistant. Ms. Hawkins told Omole that "she was hit by her boyfriend,"[4] and that she was experiencing pain in her face, wrist, back, and abdomen. She was diag-

---

1. Ms. Hawkins had previously given appellant a key to her apartment, but the safety chain was affixed to the door on this evening.

2. "Jermaine" is appellant's middle name and the name by which some people knew him, including Ms. Hawkins's sister, Bridgette Wells.

3. Emergency Medical Technician Jacqueline Pinnix responded to the call and testified that Ms. Hawkins was upset and crying. Ms. Hawkins told Pinnix that she was experiencing pain in her head, stomach, and back.

4. Ms. Wells testified that Ms. Hawkins called her from the hospital and also told her that appellant had assaulted her.

nosed with a sprained wrist, which was put in a soft cast. At trial, Ms. Hawkins testified that as a result of the assault, she had a "swollen lip, black eye ... [and] bruised kidney," and described the level of pain in her arm as "severe."[5] She also testified that, despite these injuries, she continued her relationship with appellant because she "was still in love with Mr. Earl and ... [she] was also in fear of Mr. Earl."

*August 9, 2003 Assault*

A month later, on August 9, 2003, appellant called Ms. Hawkins at work to tell her that he wanted to return the keys to her apartment. Appellant drove to her workplace and waited for her to finish her shift. When he saw Ms. Hawkins, he opened his car door and offered her a ride, which she accepted because she "was scared and ... didn't want him to hit [her]," and she was afraid that he would try to "force [her] to get into the car."

After they arrived at her apartment, Ms. Hawkins let appellant inside because she "was afraid that if [she] didn't allow him into [her] apartment, that he would hit [her]." Once he was in the apartment, appellant asked her, "You want me to hit you, don't you?" When Ms. Hawkins said "no," appellant punched her three times in the stomach. He then picked up a nearby umbrella and hit her on the head with it twice.

According to Ms. Hawkins, when appellant saw a framed picture on a nearby table of Ms. Hawkins and her ex-husband, Steven Hawkins, he told her, "I can't believe you have a picture of another man in your apartment knowing that I come into this apartment." Appellant grabbed her in a choke hold, and as the two were struggling near the windows, he released the choke hold and pushed her out an open window, causing her upper body to "dangl[e] from the window." Ms. Hawkins grabbed the outer ledge of her windowsill and yelled out "help, he's trying to kill me!" Appellant was holding both her legs, but Ms. Hawkins struggled and managed to free her left leg. Moments later, appellant let go of her right leg, which caused Ms. Hawkins to fall out of the window. As a result of the fall, she suffered two broken ankles, scrapes and bruises, and for a time had to wear a neck brace.

Again, Ms. Hawkins did not immediately reveal the name of her assailant when the police arrived on the scene, telling the officers that she "jumped out the window because [her] boyfriend was trying to kill [her]." Ms. Hawkins testified that she also did not tell the police that appellant pushed her out the window because she was afraid that appellant would attack her again and because she still loved him. When she arrived at the hospital, she again informed the attending physician that she jumped out the window because her boyfriend was attempting to kill her. It was not until the next day, when she spoke to her sister, Ms. Wells, that Ms. Hawkins said that appellant had pushed her out the window.

*The Defense Case*

Appellant denied assaulting Ms. Hawkins on either July 9 or August 9, and it was the theory of the defense that appellant was the victim in the relationship. According to appellant, he tried ending his relationship with the complainant several times, but when he did, Ms. Hawkins would "threaten to call the other women in

---

**5.** Prior to the assault, Ms. Hawkins had a bone cyst near her wrist. According to Omole, Ms. Hawkins's wrist was sprained as a result of the assault, but it was likely that the cyst aggravated the pain. At trial, Ms. Hawkins testified that her wrist did not hurt before the assault.

his life and tell them bad things, that he was going out with [other women]."

According to the defense, the complainant's accusations that appellant assaulted her were simply instances where she followed through with her threats. In opening statement, defense counsel told the jury:

[Ms. Hawkins] would threaten to have him arrested for abuse. And she told him it would be easy for her to have him arrested because he was big, he was dark complected, and he was a man. No one would believe him if she went in to the police. No one would believe him.

On direct examination, when asked whether Ms. Hawkins would threaten him if he attempted to end their relationship, appellant testified that she "would say to me that it would be easy to convict me of domestic violence because of my size and because I was a black man [and] ... these factors [] would play against me if she ever called the police, if she ever made up any kind of allegation that I beat her." [6]

Appellant testified that he never visited Ms. Hawkins on July 9, the day she claimed he punched her repeatedly, but that he did visit her at her apartment a few days later, between July 11 and 13. According to appellant, while there, "Ms. Hawkins told [him] that around the 4th of July, or around that holiday or whatever, she tried to call and contact [him], but that [he] didn't respond. And that she called her husband up, Steven, and he came past." Appellant testified that Ms. Hawkins told him that at some point while Mr. Hawkins was in her apartment, he saw some of appellant's clothes and "got very

angry and jumped on her and he beat her ... [and] broke her arm."

With respect to the August 9 assault, it was the theory of the defense that Ms. Hawkins jumped out of the window of her own accord and was using the incident to frame appellant because she was jealous and wanted to get back at him. According to appellant, some time in July Ms. Hawkins informed him that she was pregnant. On August 9, he went to Ms. Hawkins's workplace to return her keys and she said to him, "I know you are not going to leave me stranded in the rain like this. Could you give me a ride home?" He agreed, and when they arrived at her apartment, Ms. Hawkins said that she would like him to accompany her inside because "she wanted to talk about the baby."

Once inside, appellant saw a picture of another man. Appellant admitted that he inquired about the identity of the man in the photograph. He testified that he told Ms. Hawkins that "[t]his picture is probably of a guy that you are involved with, and that is who you are probably pregnant by, and I am leaving." According to appellant, as he was unlocking the front door, Ms. Hawkins said "I am going to jump out the window." As she began to lean out the window, appellant grabbed her shoulders in an attempt to prevent her from jumping. Ms. Hawkins managed to free her upper body and leaned out the window, and appellant "grabbed her waist with both [hands]." Ms. Hawkins then screamed "Help. Police. He is trying to kill me." Appellant saw another woman, Ms. Hawkins's neighbor, on the street, and according to appellant, she responded to Ms. Hawkins's cry for help, asking "[w]hy don't you get out of the window before you fall and hurt yourself?" [7]

---

6. Appellant was 6′5″ tall and weighed about 300 pounds. Ms. Hawkins was 4′11″ and weighed 175 pounds.

7. The neighbor, Shawarn Nelson, testified for the government. According to Nelson, she saw Ms. Hawkins "hanging out the window hollering 'help, he's trying to kill me.'" Ac-

Appellant then told Ms. Hawkins that he was "getting ready to leave," and let go of her waist. He started walking towards the front door of the apartment, turned around, and saw Ms. Hawkins step outside the window. According to appellant, he could hear "people on the outside of the apartment saying 'no, baby[,] don't do that[,] don't do it.'" [8] Appellant left the apartment, and when he went outside, he saw Ms. Hawkins crawling around on the ground. As he walked by he said, "I cannot believe this crazy bitch just jumped out the window on me."

## Analysis

### I. *Expert Testimony Relating to Battered Woman's Syndrome*[9]

■ Appellant argues that the trial judge erred in permitting the government's expert witness, Dr. Lorraine Chase, to testify about "patterns in behavior in domestic violence." The court denied appellant's pre-trial motion to exclude Dr. Chase's testimony about battered woman's syndrome, concluding that the testimony was admissible to explain why Ms. Hawkins continued to have contact with appellant even after he assaulted her on July 9, 2003.[10]

At the beginning of Dr. Chase's testimony, the trial judge explained to the jury that Dr. Chase would "testify as an expert concerning domestic violence and the dynamics of abusive relationships," but that she would not "offer an opinion, nor [would] she [be] permitted under the rules of evidence, to offer an opinion on whether Barbara Hawkins is a victim of domestic violence[,] nor [would] she offer an opinion as to whether Mr. Reginald Earl has engaged in any acts of domestic violence." Dr. Chase testified in general terms to common tactics used by abusive partners to "exercise power and control," and how those tactics create a cycle in which the victims do not leave the abusers because they believe that "they are somehow responsible for the abuse they receive." She did not make any specific reference to the complainant or appellant, or to their relationship.

■ "[T]he evaluation and weighing of evidence for relevance and potential prejudice is quintessentially a discretionary function of the trial court, and we owe a great degree of deference to its decision." *Johnson v. United States,* 683 A.2d 1087, 1095 (D.C.1996) (en banc). "Particularly where expert testimony is concerned, reversals on this ground do not abound."

---

cording to Nelson, she did not see Ms. Hawkins fall out of the window and hit the ground because she was inside calling the police. She testified that she called the police several times, including after she saw Ms. Hawkins lying on the ground injured. Nelson testified that she told the police that Ms. Hawkins "jumped" because she "wanted them to hurry up and come."

**8.** Nelson also testified that after she saw Ms. Hawkins on the ground, she overheard some other people on the scene "saying she jumped." None of these other witnesses testified at trial.

**9.** In *(Gregory) Nixon v. United States,* 728 A.2d 582 (D.C.1999), we described the "bat-

tered woman syndrome" as "a series of common characteristics found in women who are abused both physically and emotionally by the dominant male figures in their lives over a prolonged [period] of time." *Id.* at 584 n. 1 (citations omitted).

**10.** At the motions hearing, the trial judge noted that the government sought to introduce Dr. Chase's testimony because "even in this day and age[,] there are lots of people who have no concept that women stay in abuse relationships ... and ... once battered, a syndrome sometimes develops that causes the woman to stay in the relationship despite all the logic that suggests otherwise that she should get out."

(*Gregory*) *Nixon*, 728 A.2d at 594. This court and courts in other jurisdictions have recognized the relevance of expert testimony relating to battered woman's syndrome in certain contexts, for example, to bolster the credibility of the complainant where she has been impeached by her recantation of her allegation of abuse, *see, e.g., id.* at 587, 590–92, or to establish the reasonableness of a complainant's fear in a case where the complainant claims self-defense to a charge of violence against her abuser, *see, e.g., State v. Wyatt*, 198 W.Va. 530, 482 S.E.2d 147, 158 (1996).

Appellant argues that Dr. Chase's testimony about patterns in abusive relationships and the domestic violence that can occur in those relationships combined with the evidence of the tumultuous relationship between appellant and Ms. Hawkins created the impression that she suffered from the syndrome because she had been battered by appellant. As a result, according to appellant, the jury was likely to have viewed Dr. Chase's testimony as akin to character evidence establishing appellant's predisposition to domestic violence and used the testimony to establish that appellant did, in fact, assault Ms. Hawkins on the two days in question. *See, e.g., Kenyon v. State*, 96 P.3d 1016, 1025 (Wyo.2004) ("When battered-woman-syndrome testimony is raised by the State in its case-in-chief and relates to a defendant, ... the testimony draws close to commenting directly on what likely happened and looks like character evidence after all. Evidence concerning a defendant's involvement demands close scrutiny under the character evidence rules. This is so even if reference to the defendant may only be inferred from the testimony.") (internal quotation marks and citations omitted).

We conclude that it was within the trial judge's discretion to admit Dr. Chase's testimony. With respect to the July 9 assault, Ms. Hawkins lied to the police, saying that her assailant was "Jermaine Wilson." She also equivocated as to whether she had jumped (albeit out of fear of being killed) or been pushed. Dr. Chase testified that battered women are generally not inclined to report their abusers to the authorities because of the "shame and embarrassment" of reporting, the fact that they still care for their abusers, and fear of reprisal. Ms. Hawkins testified that she both loved and feared appellant. The expert testimony, therefore, assisted the jury in understanding why Ms. Hawkins did not immediately identify appellant as her assailant. *See People v. Morgan*, 58 Cal.App.4th 1210, 1216, 68 Cal.Rptr.2d 772, 775 (Cal.Ct.App. 1997) (noting that expert testimony on battered woman's syndrome could "help explain [the victim's] delay in reporting the abuse and her last-minute recantation of the charges") (internal quotation marks and citations omitted). It also aided the jury in assessing Ms. Hawkins's credibility, given her misrepresentations to the police. *People v. Brown*, 33 Cal.4th 892, 16 Cal.Rptr.3d 447, 94 P.3d 574, 583 (2004) ("When the trial testimony of an alleged victim of domestic violence is inconsistent with what the victim had earlier told the police, the jurors may well assume that the victim is an untruthful or unreliable witness.").

Moreover, we have also stated that where the judge instructs the jury that the expert testimony concerning battered woman's syndrome is not evidence that the defendant is predisposed to violence or evidence that the defendant committed any particular act of violence, the instruction "dispel[s] any fear of unfair prejudice." (*Gregory*) *Nixon*, 728 A.2d at 595 (quoting *People v. Christel*, 449 Mich. 578, 537 N.W.2d 194, 201 n. 24 (1995)). Here, the limiting instruction made clear that Dr. Chase's testimony was not evidence that

appellant had, in fact, committed either one of the assaults for which he was tried, or that he was predisposed to domestic violence. And at the end of trial, the judge instructed that the expert's testimony "was presented to provide [the jury] with information about the ranges of behavior exhibited by victims of domestic violence and, therefore, to help [the jurors] in explaining certain kinds of conduct by victims of domestic violence." There being nothing in the record to suggest otherwise, we presume that the jury followed those instructions. *See Allen v. United States,* 603 A.2d 1219, 1224 (D.C.1992) (en banc). Accordingly, we reject appellant's argument that the expert testimony on battered woman's syndrome was an end-run around the prohibition against evidence of a propensity for violence.

## II. *Exclusion of the Complainant's Message on Appellant's Answering Machine*

Appellant argues that the trial judge improperly excluded an audio-tape recording of a message left by Ms. Hawkins on appellant's answering machine that he sought to introduce to show that Ms. Hawkins was biased against him because she was jealous and for financial reasons. To put the claim in context, some background is necessary. Ms. Hawkins testified at trial that, sometime in 2000, she and appellant were in bed at his apartment when he answered a phone call from an ex-girlfriend. Ms. Hawkins asked appellant to get off the phone, and when appellant responded that he would not, she went outside, picked up a brick from the ground, and threw it at appellant's car, shattering the window. During cross-examination, she denied that her motivation for throwing the brick was jealousy of appellant's

relationship with other women. According to Ms. Hawkins, she was "angry" because, by refusing to hang up the phone upon her request, appellant was "disrespecting" her.

Following the incident, Ms. Hawkins left two messages on appellant's home answering machine. At appellant's request, the trial judge ruled before trial that the first message was admissible to impeach Ms. Hawkins's testimony that she was not jealous of his relationship with other women.[11] In that message, Ms. Hawkins said that she intended to tell another woman, Marian Matthews,[12] about "what [appellant does]" with his ex-girlfriend. In the second message, Ms. Hawkins again commented about appellant's sexual relationships with other women, and also expressed anger about having to pay to repair the damage she caused to his car. The trial judge excluded the second message, however, on the basis that the tape was "not probative of anything," despite appellant's claim that the message was relevant for three different reasons.

■ First, appellant argues that Ms. Hawkins's comment in the second message that appellant "think[s] with [his] head in his pants," establishes that she was jealous of his relationship with other women, and, like the first message, impeached Ms. Hawkins's testimony that she was not motivated by jealousy. Assuming that the comment permitted the inference that Ms. Hawkins was jealous, because the first tape established the same point, we conclude that it was within the trial judge's discretion to exclude the tape as cumulative. *See District of Columbia v. Bethel,* 567 A.2d 1331, 1336 (D.C.1990) ("A trial judge has considerable discretion with respect to the admission or exclusion of cumulative evidence."). For the same

---

11. Defense counsel, however, did not introduce the tape of the first message at trial.

12. Appellant lived with Ms. Matthews and, at the time of trial, he was engaged to her.

reason, even if the trial court erred in excluding the second tape, its exclusion did not harm the defense's ability to make the point that the complainant was jealous, an inference the jury could easily draw from the more graphic illustration that she threw a brick at his car when appellant answered a call from a former girlfriend while in complainant's company. *See Malloy v. United States*, 797 A.2d 687, 690–91 (D.C.2002) (citing *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946));[13] *Watson v. United States*, 612 A.2d 179, 184 (D.C.1992) (noting that erroneous exclusion of evidence is generally harmless if other evidence establishing the same facts is before the jury in another form).[14]

■ Appellant also argues that the tape of the second message was relevant to rebut the government's "theme" that appellant "didn't work and was sponging off" Ms. Hawkins,[15] because in that message she used an "angry" tone in referring to the repair estimate appellant gave her for

the car window she smashed when she threw a brick at his car. We agree with the trial judge that the fact that Ms. Hawkins was upset about the amount of the estimate has no logical relevance to the issue of whether appellant took financial advantage of Ms. Hawkins. Without information as to the amount of the repair estimate relative to the actual damage to the car, the fact that she was angry about having to pay for the car damage does not make it more or less likely that appellant was "sponging off" the complainant. In any event, the financial relationship between appellant and Ms. Hawkins was not a material issue relating to the two alleged assaults, and as a result, even if the tape did rebut the government's suggestion that appellant took financial advantage of Ms. Hawkins, any error in excluding the tape was harmless. *See Kotteakos*, 328 U.S. at 765, 66 S.Ct. 1239.

■ Finally, appellant argues that Ms. Hawkins's statements on the tape express-

**13.** The government argues that appellant should have to establish plain error in the trial court's exclusion of the second taped message. When she ruled to exclude the message, the trial judge said that she was having difficulty understanding the words uttered on the tape because of the poor quality of the recording, and that she would consider reading a transcript of the message. According to the government, the trial judge's offer to read a transcript made her prior exclusion of the tape a "provisional ruling," and, as such, required defense counsel to renew his request for admission in order to preserve the objection for appeal. *See, e.g., Medrano–Quiroz v. United States*, 705 A.2d 642, 648 (D.C.1997) ("[W]here the judge has denied a defendant's prayer for relief during an earlier stage of a trial, and where the circumstances have changed as the case has progressed, a defendant must renew his request on the basis of the changed circumstances in order to preserve for appeal any contention based on the record as modified."). Alternatively, the government argues, we should decline to consider the claim of error altogether because de-

fense counsel made a tactical decision not to renew his request for admission. *See James v. United States*, 580 A.2d 636, 642 (D.C. 1990). Because we conclude that any error would be harmless under the more lenient *Kotteakos* standard, we need not decide whether plain error review applies because the trial judge made a provisional ruling requiring further objection, or whether appellant abandoned his claim on appeal by making a tactical decision to not place the tape recording before the jury.

**14.** Here the jury did not hear the first message, but that was because the defense chose not to introduce it, in spite of instead of the trial judge's ruling that it could be admitted.

**15.** During Ms. Hawkins's direct examination, the prosecutor elicited the fact that Ms. Hawkins was employed and appellant was unemployed, and that appellant "wanted to know how much [money Ms. Hawkins] made, where [her] money was going, [and] who [she] was giving [her] money to."

ing dissatisfaction with the amount of the damage estimate for the car window established that she had a "monetary bias" against appellant. Although evidence of bias is always relevant, *see Hollingsworth v. United States*, 531 A.2d 973, 979 (D.C. 1987), even if the trial judge erred in excluding the tape on this basis, any error was nonetheless harmless, because defense counsel was able to establish the same point during the examinations of Ms. Hawkins and appellant. Ms. Hawkins admitted that she initially refused to pay for the damaged window, and that she obtained a restraining order against appellant after appellant had obtained a restraining order against her, following the damage she caused to the car. She "agreed to drop" the restraining order against appellant when appellant agreed not to pursue a domestic violence charge against her. In cross-examining Ms. Hawkins, defense counsel implied that her restraining order was "just [her] way of trying to keep from having to pay [appellant] money." Moreover, appellant testified that Hawkins "made some threats to [him] about her pursuing avenues of retaliation against [him] for ... trying to get [his] window fixed," and that she threatened to tell her brothers that he "took money from [her]." Therefore, the jury already had before it evidence that Ms. Hawkins was purportedly angry about having to pay for the damage to appellant's car, and, as such, the tape was merely cumulative.[16] Accordingly, we conclude that even if the trial court erred in excluding the tape, the error was harmless. *See Watson*, 612 A.2d at 184.

### III. Sufficiency of the Evidence of Aggravated Assault

■ We agree with appellant, with regard to the July 9 attack, that the evidence was insufficient to establish the element of aggravated assault that requires the attack to result in "serious bodily injury." D.C.Code § 22–404.01(a)(2) (2001).[17]

■ "Serious bodily injury" is defined as "bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty." D.C.Code § 22–3001(7) (2001); *(Troy) Nixon v. United States*, 730 A.2d 145, 149 (D.C.1999). In making fact findings concerning this element of the offense of aggravated assault, the jury "may infer from a description of the nature and extent of injuries that an individual has suffered 'serious bodily injury' as defined." *Anderson v. United States*, 857 A.2d 451, 464 (D.C.2004) (citing *Gathy v. United States*, 754 A.2d 912, 918–19 (D.C.2000)). As with all claims of evidentiary insufficiency, we view the evidence of injury and draw all inferences in the light most favorable to the government. *See Gordon v. United States*, 783 A.2d 575, 580 (D.C. 2001). Notwithstanding this deference, we must be satisfied that the evidence sufficed to prove the essential elements of the offense beyond a reasonable doubt.

We recently discussed the evidentiary standard for establishing "serious bodily injury" in *Swinton v. United States*, 902 A.2d 772 (D.C.2006),

---

16. To the extent appellant argues that the tape was more compelling evidence of bias than the trial testimony of appellant and Ms. Hawkins because of her "angry" tone in the taped message, the trial court found—and we agree, after having listened to the tape—that the tone was not particularly "venom[ous]."

17. Appellant understandably does not challenge that Ms. Hawkins suffered serious bodily injury when she had two broken ankles and had to wear a neck brace as a result of her fall from the window on August 9.

Our decisions since [*Troy* ] *Nixon* have emphasized the high threshold of injury that the legislature intended in fashioning a crime that increases twenty-fold the maximum prison term for simple assault.... The injuries in these cases usually were life-threatening or disabling. The victims typically required urgent and continuing medical treatment (and, often, surgery), carried visible and long-lasting (if not permanent) scars, and suffered other consequential damage, such as significant impairment of their faculties. In short, these cases have been horrific.

*Id.* at 775 (internal quotation marks and citations omitted).

Like in *Swinton,* the government asks us to affirm the conviction for aggravated assault on the basis that, as a result of appellant's attack, Ms. Hawkins suffered "extreme physical pain." The term "extreme physical pain" is "regrettably imprecise and subjective," but the statute requires the level of pain to be of "the highest or the greatest possible degree" or "unbearable." *Id.* at 777. In addition to the bruises to her body and kidney, Ms. Hawkins suffered a sprained wrist that required a soft cast. Notwithstanding Ms. Hawkins's own characterization of her pain as "severe," as in *Swinton,* we conclude that the injuries sustained do not permit a jury reasonably to infer, from the "nature and extent of injuries," that the complainant experienced "extreme pain" of the degree required for conviction of aggravated assault. In *Swinton,* the "victim's only physical injuries were bruises" which were "a few or several centimeters in diameter, on her left arm and inner thighs." 902 A.2d at 774. The victim "testified that she 'hurt bad' and

screamed in pain when [the attacker] punched her." *Id.* at 777. The injuries Ms. Hawkins sustained were slightly more serious, including a bruised kidney and sprained wrist, but were not "life threatening or disabling." *Id.* at 775. Accordingly, we reverse appellant's conviction for aggravated assault related to the assault on July 9, and remand so that the trial court may vacate that conviction and enter a judgment of conviction of the lesser-included offense of simple assault and re-sentence appellant accordingly.[18]

*So ordered.*

---

**18.** Appellant was sentenced to consecutive terms of imprisonment of three years for the July 9 assault and eight years for the August 9 assault. The maximum sentence for the simple assault on July 9 is 180 days. *See* D.C.Code § 22–404(a).