**David JACKSON, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 99–CF–1460, 05–CO–1228.**

District of Columbia Court of Appeals.

Argued Oct. 30, 2007.

Decided Jan. 17, 2008.

Richard S. Stolker, Rockville, MD, appointed by the court, for appellant.

Mary Chris Dobbie, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney, Roy W. McLeese III, and Kacie M. Weston, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN, Associate Judge, STEADMAN, Senior Judge, and KRAVITZ, Associate Judge, Superior Court of the District of Columbia.[*]

KRAVITZ, Associate Judge:

A Superior Court jury found appellant David Jackson guilty of aggravated assault while armed and assault with a dangerous weapon for beating his estranged wife with a hammer. The trial court imposed consecutive prison sentences for the two convictions, including a life term for aggravated assault while armed, and later denied appellant's motion to set aside the judgment pursuant to D.C.Code § 23–110 (2001). In these consolidated appeals, appellant argues principally (1) that the evidence of "serious bodily injury" presented at trial was insufficient as a matter of law to support his conviction of aggravated assault while armed; and (2) that the trial court erred in rejecting, without a hearing, his post-conviction claims of ineffective assistance of counsel. We reverse appellant's conviction for aggravated assault while armed but otherwise affirm the judgment and the denial of post-conviction relief.

## I.

Appellant went to trial in November 1998 before Judge Stephen G. Milliken on one count of threatening to injure a person, one count of aggravated assault while armed with a hammer, two counts of assault with a dangerous weapon (one alleging the use of a hammer, the other a fan), and two counts of first-degree sexual abuse. The charges arose from an incident in which appellant was alleged to have beaten and sexually assaulted his fifty-two year-old wife, Dorothy Irby, inside her apartment on March 24, 1998.

Evidence presented at trial established that appellant and Irby were married and living together when Irby learned, on March 2, 1998, that appellant was having an affair with another woman. Irby confronted appellant about the affair, and appellant moved out of the couple's apartment at 800 Southern Avenue, S.E. Irby subsequently told appellant by telephone on March 23, 1998 that the apartment was no longer his home. In response, appellant allegedly threatened Irby by stating, "I know you want me to come over there and to hit you upside of your head."

That night, March 23–24, 1998, Irby awoke between 12:30 and 1:00 a.m. to the sound of appellant banging on her apartment door. Irby let appellant inside, and appellant punched Irby in the back of her head and accused her of having her own affair. Irby denied having an affair, but appellant persisted in his assault, opening a gash on Irby's right ear by hitting her on the side of her head with a hammer. Over a period of several hours, according to Irby's testimony at trial, appellant then used the hammer, his fists, and a metal fan to beat Irby repeatedly on her face, head, legs, and body. Asked at trial to describe her pain during the assault, Irby said that

* Sitting by designation pursuant to D.C.Code § 11–707(a)(2001).

she experienced "regular shock, sharp pains, you know."

At some point, Irby, who was bleeding from her ear, nose, head, and legs, asked appellant to take her to the hospital. Appellant refused, telling Irby that he wanted to have sex with her instead. Irby testified that she declined to have sex but that appellant ripped off her nightgown and forced his penis into her vagina and mouth. Irby ultimately persuaded appellant to go to sleep in her bed, and once appellant was safely asleep, Irby slid out of the bed, got dressed, left the apartment, and walked three blocks to a McDonald's, where she used a pay phone to call 911. It was approximately 6:00 a.m.

Officer Bertha Rice–Riley responded to the 911 call and met Irby in the street outside the McDonald's. Irby reported the assault to Rice–Riley, who observed that Irby's face was swollen and that Irby had blood on her pants. The officer drove Irby back to the apartment, where they found appellant still asleep in Irby's bed. The officer woke appellant and took him into custody. She then called for an ambulance, and paramedics arrived soon thereafter and treated Irby inside the apartment before taking her to the emergency room at D.C. General Hospital.

A crime scene search officer, Joseph Morquecho, arrived later at Irby's apartment and recovered a bloody hammer and took photographs of blood he observed in the bedroom of the apartment. The photographs, offered by the government at trial, showed scattered splotches of blood on the bed and a few drops on the floor and walls.

Hospital records admitted in evidence at trial established that Monique Johnson, a triage nurse at D.C. General Hospital, examined Irby upon her arrival at the emergency room. *After determining that* Irby's blood pressure and pulse were normal, Johnson referred Irby to the hospi-

tal's Minor Trauma Unit, where Irby was examined by a trauma surgeon named Dr. Festus Halay. Halay found a four-centimeter "split" laceration that went all of the way through the skin and cartilage of the outer part of Irby's right ear, a three-centimeter laceration on the back of Irby's head, substantial bruising on Irby's cheeks and neck and around both eyes, a two-centimeter and a three and one-half-centimeter laceration on Irby's right shin, and a three-centimeter laceration on Irby's left shin. Halay also found minor bruising and scratches on Irby's chest, left breast, right side, and left and right shoulders. He sutured all of the lacerations, using fourteen stitches to close the wound on Irby's right ear alone. At trial, the government presented photographs of Irby's bandaged right ear, of the bruising to Irby's face and body, and of the sutured lacerations on Irby's shins and on the back of her head.

Halay testified that the laceration to the outside of Irby's right ear was "to some extent" a serious injury because torn cartilage poses a risk of infection if it is not repaired right away. As to Irby's other lacerations, Halay testified that the cut on the back of Irby's head was "not very bad" because it went through only the skin and did not affect the skull, and that the cuts on Irby's shins were similarly "skin-deep" and "not very serious." Irby had testified earlier in the trial that an x-ray taken of her nose at the hospital showed a broken bone at the top of her nose, but Halay told the jury that the x-ray of Irby's nose was "normal" and that x-rays of Irby's cheeks and skull and a CT-scan of Irby's head and brain, all taken at the hospital on the morning of the incident, showed no fractures, broken bones, or other abnormalities. Halay also testified that Irby was alert and oriented at the hospital and that she reported no loss of consciousness either during or after the assault. Halay did say that Irby was "really tender ... to

palpation on her nose" and "was having pain, no question about that," and he told the jury that before Irby was discharged from the hospital he gave her a prescription for Tylenol No. 3. However, the government presented no evidence indicating whether Irby ever actually took any pain medication or even filled the prescription she was given, and neither Irby nor any of her treating medical professionals testified to any ongoing pain Irby may have experienced following her treatment in the emergency room on the morning of the assault.

Irby went to her personal physician, Dr. Jack Summers, for a follow-up visit on March 31, 1998, one week after the assault. Summers removed the sutures from the lacerations on Irby's ear, head, and shins, and he observed that Irby had abrasions on her chest, a black and blue face, "blood bruising" around her nose, and a bloody right eye.

Summers testified that the laceration to Irby's ear was the most significant of her injuries. Summers had not seen Irby in the approximately eight months between her visit to his office and the trial, but he testified that the laceration to the ear would not affect Irby's hearing and that the wound appeared on March 31, 1998 to have "healed well" even though it "would definitely leave a scar." Summers gave Irby a referral to a plastic surgeon in the event that Irby might need some cosmetic reconstruction on her ear, but he testified that Irby never followed up on the referral, presumably, he told the jury, because her ear "healed relatively satisfactorily right from the emergency room treatment." Summers also told the jury that the laceration to the back of Irby's head was "relatively minor" and that he expected it to heal with "minimal scarring" and be fully covered by her hair. As for the lacerations on Irby's shins, Summers testified that the wounds had "healed fine" but that they would leave "cosmetic scars" that

would be "quite noticeable over her shins on both legs." Summers described the scratches to Irby's chest as "of no long term significance," and the evidence showed that Summers neither prescribed additional medication for Irby on March 31, 1998 nor asked her to schedule another follow-up appointment.

At the request of the prosecutor, Irby stepped down from the witness stand at trial and exhibited scars on her right ear and shins for the jury. However, neither Irby, the trial judge, the prosecutor, nor the defense lawyer provided any description for the record of the appearance of Irby's scars, and the record on appeal contains no evidence or formal descriptive comments concerning the actual extent of the scarring at any time after Irby's visit with Summers one week after the assault. The only indication in the record of the appearance of Irby's scars after her follow-up visit with Summers is a comment by the trial judge, made at trial in the course of his oral ruling denying appellant's motion for a judgment of acquittal, that the injury to Irby's ear had "resolved nicely."

The jury returned a verdict on November 19, 1998, finding appellant guilty of aggravated assault while armed and of assault with a dangerous weapon (hammer). Apparently unconvinced by certain portions of Irby's testimony, the jury found appellant not guilty of assault with a dangerous weapon (fan) and of both counts of first-degree sexual abuse. At sentencing on September 22, 1999, following the appointment of new counsel for appellant, Judge Milliken imposed consecutive prison terms of fifteen years to life for aggravated assault while armed and forty months to ten years for assault with a dangerous weapon.

Appellant filed a timely notice of appeal from the judgment of conviction. He subsequently indicated, however, that he

wished to prosecute a motion to set aside the judgment pursuant to D.C.Code § 23–110. At appellant's request, we stayed the direct appeal pending the trial court's resolution of the post-conviction motion, which appellant ultimately filed, through a third lawyer, on January 8, 2005. *See Shepard v. United States,* 533 A.2d 1278, 1280 (D.C. 1987).

Appellant alleged in his post-conviction motion that his lawyers provided deficient representation at both trial and sentencing, in violation of his Sixth Amendment right to the effective assistance of counsel. Judge John M. Mott, to whom the case was assigned following Judge Milliken's retirement, issued a written order on October 2, 2005 denying appellant's motion without a hearing.

Appellant filed a timely notice of appeal of the denial of his post-conviction motion. We lifted the stay on appellant's direct appeal and ordered that the two appeals be consolidated for all purposes.

## II.

The statute that creates the offense of aggravated assault in the District of Columbia makes "serious bodily injury" an essential element of the crime but does not define the term. *See* D.C.Code § 22–504.1 (1997 Supp.), recodified as § 22–404.01(a) (2001). In *Nixon v. United States,* 730 A.2d 145, 149–50 (D.C.1999), we concluded that the definition of "serious bodily injury" contained in a statute pertaining to sentencing enhancements for sex offenses, *see* D.C.Code § 22–4101(7) (1998 Supp.), recodified as § 22–3001(7) (2001), should be applied to the same term in the aggra-

vated assault statute. We thus construed "serious bodily injury" in the aggravated assault statute to include only "bodily injury that involves a substantial risk of death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty." *Id.* We adopted this highly restrictive definition to avoid the danger that "jurors may set the standard of 'aggravation' below what the legislature intended in fashioning a crime that increases twenty-fold the maximum prison term for a simple assault." *Zeledon v. United States,* 770 A.2d 972, 977 (D.C.2001).[1]

Our decisions since *Nixon* have repeatedly emphasized "the high threshold of injury" required to prove aggravated assault and have found the evidence of serious bodily injury legally sufficient only in cases involving "grievous stab wounds, severe burnings, or broken bones, lacerations and actual or threatened loss of consciousness." *Swinton v. United States,* 902 A.2d 772, 775 (D.C.2006) (footnotes omitted). "The injuries in these cases usually were life-threatening or disabling. The victims typically required urgent and continuing medical treatment (and, often, surgery), carried visible and long-lasting (if not permanent) scars, and suffered other consequential damage, such as significant impairment of their faculties. In short, these cases have been horrific." *Id.*

Recently, the District of Columbia Council implicitly endorsed our strict construction of the "serious bodily injury" requirement in the aggravated assault statute.

---

1. The twenty-fold increase identified in *Zeledon* refers to the approximate difference between the maximum prison terms authorized by law for the unarmed offenses of aggravated assault and simple assault—specifically, ten years for aggravated assault, D.C.Code § 22–404.01(b) (2001), and 180 days for simple assault, D.C.Code § 22–404(a)(1) (2007 Supp.). When, as in the case now before us, a deadly or dangerous weapon is involved, the maximum prison term for aggravated assault while armed is life, D.C.Code § 22–4502(a) (2001), while the maximum prison term for assault with a dangerous weapon is ten years, D.C.Code § 22–402 (2001).

Just a few months after we issued our decision in *Swinton,* the Council amended the District's assault statute by creating a new intermediate felony offense known as "enhanced assault." Intended to "fill the gap between aggravated assault and simple assault," COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, REPORT ON BILL 16–247, THE "OMNIBUS PUBLIC SAFETY ACT OF 2006," at 6 (Apr. 28, 2006), the new offense requires proof of "significant bodily injury"—defined in the statute as "an injury that requires hospitalization or immediate medical attention," D.C.Code § 22–404(a)(2) (2007 Supp.)—and carries a maximum prison term of three years, in between the 180 days authorized for simple assault and the ten years authorized for aggravated assault. *See supra* note 1. Clearly aware of our decisions in *Nixon* and its progeny construing the "serious bodily injury" requirement for aggravated assault, the Council thus chose to create the intermediate offense of "enhanced assault" rather than to change through legislation the high threshold of injury we have interpreted the aggravated assault statute to require. *See Keene Corp. v. United States,* 508 U.S. 200, 212–13, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) (applying the presumption that Congress was aware of "earlier judicial interpretations" of a statute and, "in effect, adopted them" when it reenacted the statute without change); *Lorillard v. Pons,* 434 U.S. 575, 581, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) (stating

that the presumption is particularly appropriate where Congress has exhibited both a detailed knowledge of the statute and its judicial interpretation and a willingness to depart from certain provisions regarded as undesirable); *see also Faragher v. City of Boca Raton,* 524 U.S. 775, 804 n. 4, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

Appellant contends that the evidence presented at trial was legally insufficient to establish any of the categories of serious bodily injury recognized in *Nixon.* The government argues in response that the evidence, viewed in the light most favorable to preserving the jury's verdict, proved that appellant caused both "extreme physical pain" and "protracted and obvious disfigurement" to his wife. Although we do not mean to minimize the extent of the injuries Irby sustained as the result of appellant's criminal conduct, we are compelled by *Nixon* and its progeny to hold in appellant's favor.[2] Even viewing the evidence in the light most favorable to the government,[3] we conclude that the evidence presented at trial was insufficient as a matter of law to establish that Irby suffered either extreme physical pain or protracted and obvious disfigurement.

*Extreme Physical Pain*

We recognized in *Swinton* that the term "extreme physical pain," though regrettably imprecise and subjective, indicates "unambiguously" that the level of pain necessary to constitute serious bodily injury

**2.** The parties agree that our construction of the serious bodily injury requirement set forth in *Nixon* and its progeny applies here on direct appeal even though appellant's trial took place before *Nixon* was decided. *See Gathy v. United States,* 754 A.2d 912, 916 (D.C.2000).

**3.** In considering whether sufficient evidence has been presented in support of a criminal conviction, we view the evidence in the light most favorable to the government, giving full play to the right of the jury to determine

credibility and to weigh and draw justifiable inferences from the evidence. *Rivas v. United States,* 783 A.2d 125, 134 (D.C.2001) (en banc). However, we are "not a rubber stamp," *Swinton,* 902 A.2d at 776 n. 6, and our review is not intended to be "toothless," *Rivas,* 783 A.2d at 134. We are obligated "to take seriously the requirement that the evidence in a criminal prosecution must be strong enough that a jury behaving rationally really could find it persuasive beyond a reasonable doubt." *Swinton,* 902 A.2d at 776 n. 6 (quoting *Rivas,* 783 A.2d at 134).

"must be exceptionally severe if not unbearable." 902 A.2d at 777 (footnote and citations omitted). Indeed, we suggested in *Nixon*, 730 A.2d at 150, and again most recently in *Bolanos v. United States*, 938 A.2d 672, 681–82 (2007), that a victim's physical pain may have to be so severe as to be "immobilizing" to satisfy the serious bodily injury requirement of the aggravated assault statute.

The exacting standard we have adopted has led us on many occasions to conclude that evidence of a victim's physical pain was insufficient as a matter of law to establish serious bodily injury when the victim's pain was shown to be "merely significant." *See Swinton*, 902 A.2d at 777–78. In *Nixon*, for example, two men were shot—one was observed running from the scene of the shooting with two bullet holes in his body, including "a hole ... behind his ear with blood coming out," while the other was seen "grabbing his shoulder and the back of his shirt was bleeding like he got hit in the back of his neck or his shoulder." 730 A.2d at 148. The government, however, presented no testimony from the victims about their pain and no medical evidence establishing the true nature of their injuries. Citing the silence in the record concerning the effects of the victims' bullet wounds and the evidence that both victims were able to run from the scene after the shooting—evidence we interpreted as showing that the victims "were not unconscious and did not manifest immobilizing pain"—we held that the evidence of physical pain presented at trial

was legally insufficient to be deemed "extreme." *Id.* at 150.

We reached the same conclusion in *Alfaro v. United States*, 859 A.2d 149 (D.C. 2004), a case in which the defendant used a wet telephone cord to administer "vicious whippings" to several naked children. Evidence showed that at least one of the children "cried because the whipping hurt" and that for approximately two weeks the children had "loop-shaped markings, 'reddish pink' in color, on various parts of [their] bodies." 859 A.2d at 153, 161 n. 13. Although the extent of a victim's pain can be inferred from the nature of the victim's injuries and the victim's reaction to them, *Anderson v. United States*, 857 A.2d 451, 464 (D.C.2004), we concluded that the children's pain was neither exceptionally severe nor unbearable because the children "apparently went to bed following the whipping and then pursued their normal lives," *Alfaro*, 859 A.2d at 161 n. 13. We accordingly held that the whippings did not create "the kind of 'extreme' pain that can reasonably be compared to or equated with any of the categories of serious injury enumerated by the legislature and adopted by this court in *Nixon.*" *Id.* at 162.[4]

In *Swinton*, the defendant punched the victim with his fists on her arms and legs and allegedly forced her to have sexual intercourse with him against her will. The victim suffered bruising to her left arm and inner thighs, for which she was treated with ice packs and discharged from the hospital. The victim testified at trial that she was "hurt bad" and that she had

---

**4.** Our decision in *Alfaro* arose from a prosecution for attempted possession of a prohibited weapon with the intent to use it unlawfully. *See* D.C.Code § 22–4514(b) (2001). A key issue in the case was whether the way the defendant used the telephone cord was likely to produce *death* or "great bodily injury," a requirement if the telephone cord were to qualify as a prohibited "dangerous weapon"

within the meaning of § 22–4514(b). We construed "great bodily injury" to be the equivalent of "serious bodily injury," as defined in *Nixon* for aggravated assault prosecutions. *Alfaro*, 859 A.2d at 161–62. Our analysis in *Alfaro* of the sufficiency of the evidence of "extreme physical pain" therefore is fully applicable to our analysis of the same issue here. *See Swinton*, 902 A.2d at 777 n. 10.

"screamed in pain" during the assault. 902 A.2d at 774. She also told the jury that she was "still bruised up to this day." *Id.* However, the victim was not prescribed any medication for her pain, and she did not display her bruises to the jury or provide any further description of her residual pain. We were persuaded that the victim had "suffered *significant* physical pain," *id.* at 777 (emphasis in original), but we concluded that the victim's testimony about her pain and the evidence of her bruising were "not enough to support a finding beyond a reasonable doubt that [her] pain was not merely significant, but 'extreme,'" *id.* at 778.

Two of our most recent decisions illustrate as well as any the demanding standard we require for proof of extreme physical pain. In *Bolanos,* the defendants stabbed each of three victims multiple times during a fight between rival groups of young people on a school playground. All three victims testified at trial about the extent of their injuries, and the parties stipulated to the documentation of those injuries in the victims' hospital records. A detective testified that all three victims were in pain and that each was given Percocet at the hospital. Two of the victims, however, did not testify about the amount of pain they felt, and the evidence showed that those two victims were able to walk, with assistance, from the playground to the school nurse's office. The third victim did testify about the severity of his pain, and he stated that his pain was so bad that he had difficulty breathing, that his muscles and chest hurt, and that he kept thinking he was going to die; this third victim was given pain medication to take not only at the hospital but also following his discharge. We found the evidence of extreme physical pain legally sufficient as to the third victim. As to the first two victims, however, we concluded that their pain was not "immobilizing," given their ability to walk to safety, and we

held that the evidence of extreme physical pain was insufficient as a matter of law. 938 A.2d at 677, 681–82. In *Earl v. United States,* 932 A.2d 1122 (D.C.2007), the defendant punched and kicked his former girlfriend, leaving her with a sprained wrist, for which she had to wear a soft cast, and with bruising to her body and kidney. We recognized that the victim's injuries were more serious than the bruises suffered by the victim in *Swinton,* but we concluded that they were not life threatening or disabling and that the victim's pain, despite her testimony describing it as "severe," was not sufficiently extreme to rise to the level of serious bodily injury. 932 A.2d at 1132.

To be sure, we have upheld aggravated assault convictions since *Nixon* in particularly egregious cases in which the evidence presented at trial supported findings of extreme physical pain. All such cases, however, have involved substantial and well-documented evidence of pain and related medical treatment (often including emergency surgery and lengthy hospital stays) arising from some combination of life-threatening gunshot wounds, deep and penetrating stab wounds, broken bones, extensive internal or external blood loss, perforated organs or other serious internal injuries, loss or near loss of consciousness, and severed muscles, tendons, or nerves. *See, e.g., Payne v. United States,* 932 A.2d 1095, 1099 (D.C.2007) (victim who was stabbed sixteen times with a pair of scissors suffered two broken bones in his hand, was unable to move and was losing consciousness when he arrived at the hospital, and had to wear a cast for four months and miss eleven months of work); *Freeman v. United States,* 912 A.2d 1213, 1221–22 (D.C.2006) (victim who was shot multiple times in his torso and back moaned in pain and appeared to be confused and losing consciousness at the scene and needed treatment in a hospital trauma

unit for a broken vertebra, which caused a loss of sensation in his right leg and posed a substantial risk of paralysis and death); *Jenkins v. United States*, 877 A.2d 1062, 1071–72 (D.C.2005) (victim who was stabbed in the stomach, chest, and arm with a six-or seven-inch knife screamed when stabbed, tried to get up but fell to the ground, and had to have exploratory surgery and then stay in the hospital for five days); *Hart v. United States*, 863 A.2d 866, 875 (D.C.2004) (victim who was stabbed multiple times on both arms and in her vagina needed seventy-two stitches to close her wounds, had to spend four days in the hospital, and testified that her injuries "hurt so bad" at the time of the incident and continued at the time of trial to cause "a great deal of ongoing pain"); *Anderson v. United States*, 857 A.2d 451, 464 (D.C.2004) (victim who was stomped on and repeatedly punched in her face and stabbed in her side suffered fractures to her nose and sinus bones and a perforation to her kidney, requiring emergency surgery and pain medication for her "very painful" injuries); *Riddick v. United States*, 806 A.2d 631, 641 (D.C.2002) (victim who was repeatedly beaten, stomped, and stabbed moaned and cried in pain, was soaked in blood, and was bleeding profusely from a stab wound to her neck, which transected a muscle and damaged a nerve, requiring exploratory surgery); *Zeledon v. United States*, 770 A.2d 972, 974 (D.C. 2001) (victim who was stabbed repeatedly with a knife suffered a broken collar bone and arterial bleeding that was severe enough to have caused her death had she not received medical treatment). In each of these cases, the evidence presented at trial supported a reasonable finding by the jury that the physical pain suffered by the victim was "extreme" in that it was "exceptionally severe if not unbearable." *See Swinton*, 902 A.2d at 777.

No such finding could reasonably be made based on the evidence presented at the trial in this case. Irby was not shot or stabbed. She suffered no broken bones, no perforated organs or other internal injuries, and no severed muscles, tendons, or nerves. She bled only a moderate amount, and she never needed surgery, lost consciousness, or had to be admitted to the hospital after receiving outpatient treatment in the Minor Trauma Unit. All of her wounds except the laceration to her right ear were superficial, described by her own treating physicians as "skin deep," "relatively minor," "not very bad," and "not very serious." Even the through-and-through laceration to the outside of her right ear was described by her doctor as only "to some extent" a serious injury, and even then, it was the risk of infection—which never materialized—that was the most potentially serious aspect of the injury. Irby did testify that she experienced "regular shock" and "sharp pains," for which she was given a prescription for Tylenol No. 3 at the hospital. However, medical professionals at the hospital found Irby to be alert and oriented and her blood pressure and pulse to be normal, and the government did not present any evidence establishing, or even suggesting, that Irby ever was in shock in the medical sense. Nor did the government present any evidence indicating whether Irby actually took any pain medication or even filled the prescription she had been given. Finally, the evidence showed that Irby was able, in the midst of the assault, to devise and execute a strategy to get herself out of danger—Irby persuaded appellant to fall asleep in her bed, and then, entirely on her own, she slipped out of the bed, got dressed, left her apartment, and walked three blocks to a McDonald's and called the police. Indeed, when a police officer arrived at the McDonald's and interviewed Irby about the assault, the officer drove Irby back to the apartment instead of taking her immediately to the hospital; the

officer did not even place a call to request an ambulance until she and Irby had returned to Irby's apartment and appellant had been awakened and taken into custody.

In determining that two of the three stabbing victims in *Bolanos* were not suffering from physical pain sufficiently "immobilizing" to be deemed "extreme," we relied heavily on the ability of those two victims to walk, with assistance, the short distance from the school playground to the nurse's office. We were similarly swayed in *Nixon* by the ability of the two shooting victims to run to safety from the location of their shooting. Irby, who was able, without any assistance, to escape from appellant in the midst of the assault, certainly was no more immobilized by pain than were those victims in *Bolanos* and *Nixon*. Particularly in light of the government's failure, at a more fundamental level, to prove that Irby suffered any of the types of grievous injuries on which we have relied in upholding findings of extreme physical pain, we therefore conclude that Irby's pain, although certainly significant, was not shown to meet the "exceptionally severe if not unbearable" standard required by our precedents.

*Protracted and Obvious Disfigurement*

▆ To establish serious bodily injury through proof of "protracted and obvious disfigurement," the government had to prove (1) that Irby suffered a *"serious physical disfigurement,"* (2) that the disfigurement was "protracted" in that it remained beyond a brief recovery period, and (3) that the disfigurement had "a degree of genuine prominence" sufficient to make it "obvious." *See Swinton,* 902 A.2d at 776–77 (emphasis in original) (citing *Nixon,* 730 A.2d at 150); *see also id.* at 776 (noting that the definition of "permanent disfigurement" set forth in *Perkins v. United States,* 446 A.2d 19, 26 (D.C.1982), for the cognate crime of malicious disfig-

urement includes a circumstance in which an injury has rendered the victim "appreciably less attractive"). As with our definition of extreme physical pain, we have insisted on this rigorous standard to avoid trivializing the "high threshold of injury" erected by the aggravated assault statute. *Id.* (citing *Jenkins,* 877 A.2d at 1069).

There can be no doubt that Irby suffered a "protracted" disfigurement, as she still had scars on her ear and shins at the time of trial, eight months after the assault. More complex is the question of whether the government proved that Irby's disfigurement was sufficiently severe and "obvious" to constitute serious bodily injury. For guidance on this question, we look to our decisions in *Gathy v. United States,* 754 A.2d 912 (D.C.2000), and *Stroman v. United States,* 878 A.2d 1241 (D.C.2005).

In *Gathy,* the defendant struck the victim in the head with a glass beer bottle during a barroom brawl, breaking the bottle and causing gaping wounds to the victim's face that required forty-eight "layered" stitches to close. At trial, the government introduced two graphic photographs of the victim's wounds—one taken in the ambulance within minutes of the assault, revealing deep cuts snaking around the victim's left eye and nose, the other taken a week later, showing two facial lacerations, including one that extended from the bridge of the victim's nose all the way across his left cheek. Presuming, based on "common experience," that "wounds requiring multiple stitches are likely to leave some scarring, however faint," 754 A.2d at 918, we focused on the location of the wounds and noted that "scars in the center of one's face are more visible and prominent—and thus more disfiguring—than they might be elsewhere," *id.* We concluded, in light of the unusual severity and great

prominence of the victim's wounds, that the evidence was sufficient to enable a jury behaving rationally to find beyond a reasonable doubt that the victim suffered "protracted and obvious disfigurement" within the meaning of *Nixon. Id.* at 919.

In *Stroman,* the defendant hit the victim in her forehead with a "flip flop," causing a single cut that required fifteen stitches to close. The injury, although significant, was less severe and was in a less obvious location on the face than the injuries in *Gathy.* In the absence of any evidence that the victim suffered any actual disfigurement beyond a brief recovery period, we concluded that a single cut to the forehead, even one requiring fifteen stitches, "cannot reasonably be characterized as falling within the definition of great bodily injury." 878 A.2d at 1246.[5] We accordingly held, as a matter of law, that whatever disfigurement the victim may have suffered had not been proved to be sufficiently severe and prominent to be deemed "protracted and obvious." *Id.* at 1245–46.

Against this backdrop, we turn to the evidence presented at trial concerning the severity and prominence of Irby's wounds. The government offered photographs, taken on the day of the incident, of Irby's bandaged right ear and of the sutured lacerations on Irby's shins; the photographs showed a moderately sized bandage on the outer part of Irby's right ear and a total of three straight-line lacera-

tions of approximately one to two inches in length on Irby's shins. Irby herself stepped down from the witness stand and showed the scars on her ear and shins to the jury. Her personal physician, Dr. Summers, then testified, based upon his examination of the wounds one week after the incident, that the laceration on Irby's ear "left a scar" and that the lacerations on Irby's shins, though they have "healed fine," "will leave cosmetic scars there and they will be quite noticeable."

However, neither Irby nor any other witness testified about the appearance of the scars at any time after Irby's follow-up visit with Summers, and none of the participants in the trial made any statement for the record describing the scars as Irby exhibited them to the jury. Moreover, because the trial court, operating without the benefit of our decision in *Nixon,* did not define the term "serious bodily injury" for the jury, it is impossible on appeal to draw any sense of comfort from the jury's guilty verdict; although in some circumstances a guilty verdict returned by a properly instructed jury might cause us reasonably to infer that scars observed by the jury at trial were substantial, here the jury had not been provided any guidance in how to consider the severity of scars and other disfigurements and, indeed, had not even been told that serious bodily injury could be established through proof of protracted and obvious disfigurement.[6]

---

5. Our decision in *Stroman* arose from a prosecution for attempted possession of a prohibited weapon with the intent to use it unlawfully, *see* D.C.Code § 22–4514(b) (2001), a case in which the government was required to prove that the defendant used the flip flop in a manner likely to produce death or "great bodily injury." As we did in *Alfaro, see supra* note 4, we adopted the *Nixon* definition of "serious bodily injury" as the definition of "great bodily injury" in the possession of a prohibited weapon statute. *Stroman,* 878 A.2d at 1245–46. Our analysis in *Stroman* of

the sufficiency of the evidence of "protracted and obvious disfigurement" therefore is fully applicable to our analysis of the same issue here. *See Swinton,* 902 A.2d at 777 n. 10.

6. Appellant, who made no objection at trial to the trial court's instructions to the jury on the offense of aggravated assault while armed, has not asked us to review for plain error the trial court's failure to define the term serious bodily injury in accordance with *Nixon. Cf.* Super. Ct.Crim. R. 30; *Riddick,* 806 A.2d at 639.

Thus, although we can infer from the fact that Irby exhibited scars on her ear and shins to the jury that those scars were visible at the time of trial, at least at close range, the record contains no reliable clues regarding the size, shape, and color of the scars and the extent to which, if at all, the scars may have been noticeable. The only meaningful suggestion in the record relating to the actual appearance of any of Irby's scars at any time after her visit with Dr. Summers is Judge Milliken's comment during trial that the scar on Irby's ear had "resolved nicely."

This evidence is insufficient as a matter of law to establish either the severity or the obviousness of the disfigurement required by the aggravated assault statute. Irby's lacerations were of approximately the same severity as the cut on the victim's forehead in *Stroman*. Irby's lacerations, however, were on parts of her body—her ear and shins—that are less prominent than the forehead, and her lacerations therefore were even less likely to be obviously disfiguring than the cut in *Stroman* (and far less likely to have an appreciable effect on her physical appearance than the multiple deep cuts to the center of the victim's face in *Gathy*). In the absence of any evidence in the record of the actual appearance of Irby's scarring, our holding in *Stroman* compels the conclusion that none of the cuts suffered by Irby, either alone or in combination, was sufficiently significant and prominent to constitute "protracted and obvious disfigurement."

We conclude, accordingly, that appellant's conviction for aggravated assault while armed must be reversed. This was a vicious assault that undoubtedly resulted in significant injuries to the victim. Those injuries, however, were not proved to be sufficiently grievous to fit appellant's conduct within the narrow category of truly horrific assaults to which the offense of aggravated assault is limited by statute.

## III.

Appellant's other claims of error warrant only brief discussion. We address each in turn.

### A.

 Appellant contends on direct appeal of his convictions that the trial judge committed reversible error by failing to conduct a *voir dire* of the jury concerning a John Grisham novel the judge discovered in the jury room during an evening recess in the jury's deliberations. Appellant argues that the trial court should have questioned the members of the jury to determine whether their possible exposure to *A Time To Kill*—a novel about a man tried in the Deep South for killing a person believed to have raped his daughter—had influenced their consideration of the evidence presented at trial.

The trial court initially agreed to ask the jurors a limited set of questions about the novel. However, before the *voir dire* could be conducted, the jury sent a note indicating that it had reached a verdict. The trial court then asked the parties whether there was "any reason that [he] should not take the verdict." Counsel for the government stated that she knew of no such reason, and appellant and his counsel said nothing.

We agree with the government that appellant's silence in response to the trial court's question constituted a failure to preserve the issue for appeal. The trial court's decision to take the jury's verdict without first conducting a *voir dire* therefore is subject to review by this court under the plain error standard. *See Thorne v. United States*, 582 A.2d 964, 965 (D.C.1990).

 We find no plain error and, indeed, no error at all. It was well within the trial court's broad discretion to determine that

a juror's possible exposure to the description in a novel of a fictitious trial that bore no meaningful similarities to the case before the court did not pose a substantial risk of improper jury influence. As we stated in *Mills v. United States*, 796 A.2d 26, 35 (D.C.2002) (quoting *Cordero v. United States*, 456 A.2d 837, 841 (D.C.1983)), a careful *voir dire* examination is required only with regard to issues about which there is "a 'significant likelihood' of juror prejudice."

### B.

Appellant contends on appeal of the denial of his motion for post-conviction relief that the trial court erred in rejecting his claims of ineffective assistance of counsel without a hearing. We disagree. For the following reasons, we conclude that the trial court acted within its discretion in determining, without the need for a hearing, that the deficiencies alleged by appellant regarding the performance of his counsel at trial and sentencing did not make out viable claims under the Sixth Amendment. ·

There is a presumption that a trial court considering claims of ineffective assistance of counsel alleged in a motion for post-conviction relief under D.C.Code § 23–110 should conduct a hearing on the motion. *Lanton v. United States*, 779 A.2d 895, 901 (D.C.2001). Indeed, the statute itself expressly provides that a hearing "shall" be held "[u]nless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." D.C.Code § 23–110(c). Within this context, however, we have made it clear that a hearing need not be held if the motion "consists of (1) vague and conclusory allegations, (2) palpably incredible claims, or (3) allegations that would merit no relief even if true," *Lopez v. United States*, 801 A.2d 39, 42 (D.C. 2002) (quotation omitted), or if the trial court correctly determines that "under no circumstances could the petitioner establish facts warranting relief," *Lanton*, 779 A.2d at 901 (quotation omitted).

As a substantive matter, a person challenging his criminal conviction on grounds of ineffective assistance of counsel must make a two-part showing. First, he must demonstrate that his counsel's performance was "deficient" under prevailing professional norms—that his counsel's errors or omissions were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Second, he must establish that his counsel's deficient performance so prejudiced his defense "as to deprive [him] of a fair trial, a trial whose result is reliable"— that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687, 694, 104 S.Ct. 2052.

Appellant alleged in his § 23–110 motion that his lawyer at trial was deficient in (1) failing to put appellant's bracelet in evidence, in support of the defense theory that it was the bracelet, and not either the hammer or the fan alleged in the indictment, that caused Irby's lacerations; (2) failing to investigate Irby's mental health history for use at trial in impeaching Irby's credibility; (3) failing to make a strenuous argument that the evidence of "serious bodily injury" was legally insufficient; and (4) failing to insist on a *voir dire* of the jury following the trial judge's discovery of *A Time To Kill* in the jury room. Appellant alleged that his lawyer at sentencing was deficient in failing to present mitigating information at the sentencing hearing and in failing to dispute Irby's claim in a victim impact statement that her nose was broken in the course of the as-

sault; appellant also accused his sentencing counsel of ineffectiveness for not investigating Irby's mental health history and for not arguing the insufficiency of the evidence of "serious bodily injury."

We agree with the trial court that the motion and the files and records of the case conclusively show that each of appellant's claims fails to satisfy the *Strickland* standard. First, with regard to appellant's allegations against his trial counsel, there is not a reasonable probability that the admission in evidence of appellant's bracelet would have resulted in a different verdict at trial. There is no evidence in the record indicating that appellant was even wearing the bracelet during the assault, and the evidence presented to the jury included a photograph of the bracelet, from which the jury was free to draw appropriate inferences about the likelihood that the bracelet was the item appellant used to cause Irby's lacerations. Second, there is not a reasonable probability that the trial would have ended differently had appellant's trial counsel obtained and used Irby's psychiatric records for impeachment purposes. The use of evidence of a witness' mental health history for impeachment is greatly disfavored and is allowed only where it is shown that the evidence casts substantial doubt on the witness' capacity to comprehend and relate the truth of pertinent events. *See Velasquez v. United States,* 801 A.2d 72, 78–79 (D.C.2002). It is highly unlikely that mental health records, even if they existed, could have cast substantial doubt on Irby's credibility, given the overwhelming evidence presented at trial that corroborated the essential aspects of Irby's account of the assault. Third, it is entirely speculative to consider whether the alleged lack of forcefulness with which appellant's trial counsel made a motion for a judgment of acquittal at trial had any impact on the trial court's decision to deny the motion. The issue is moot in any event in light of

our decision today finding the evidence of aggravated assault while armed legally insufficient. Finally, our conclusion that it was within the trial judge's discretion to decide not to question the jurors about his discovery of the Grisham novel makes it clear that appellant's trial counsel did not cease "functioning as the counsel guaranteed the defendant by the Sixth Amendment" when she acquiesced in the trial judge's decision to go ahead and take the jury's verdict without first conducting a *voir dire.*

Appellant's complaints about the performance of his sentencing counsel are similarly without merit. First, the transcript of the sentencing hearing conclusively establishes that appellant's sentencing counsel did advise Judge Milliken of mitigating information about appellant's employment history and about his relatively limited prior criminal record. Second, it is not reasonably probable that Judge Milliken was in any way misled by Irby's assertion, apparently included in a written victim impact statement, that she suffered a broken nose in the assault. Judge Milliken heard all of the evidence presented at the trial, including Dr. Halay's testimony that an x-ray taken of Irby's nose in the emergency room showed no fracture, and he made no mention of Irby's victim impact statement, or of her allegedly broken nose, in explaining his sentencing decision on the record. Finally, as to appellant's assertion that his sentencing counsel should have investigated Irby's mental health history and argued the insufficiency of the evidence of serious bodily injury, Irby's putative mental health records had no apparent relevance to the trial court's sentencing decision, and the time for making a post-verdict motion for judgment of acquittal expired long before appellant's sentencing counsel was even appointed to the case, *see* Super. Ct.Crim. R. 29(c).

## IV.

Ordinarily, our conclusion concerning the insufficiency of the evidence of "serious bodily injury" would cause us to remand the case to the trial court with instructions to vacate appellant's conviction of aggravated assault while armed and to enter a judgment of conviction on the lesser-included offense of assault with a dangerous weapon (hammer). *See Bolanos,* at 687. Appellant, however, has already been convicted and sentenced on a separate count of assault with a dangerous weapon (hammer), and the government concedes on appeal that the two convictions merge because neither relates to conduct that arose from a fresh impulse. *See Simms v. United States,* 634 A.2d 442, 447 (D.C.1993). We accordingly remand the case to the trial court with instructions to vacate appellant's conviction for aggravated assault while armed, to enter a judgment of acquittal on that count (and all possible lesser-included offenses), and to leave in place the existing judgment of conviction for the offense of assault with a dangerous weapon (hammer).

*So ordered.*